**GREATER FREMONT, INC., Plaintiff,**

v.

**CITY OF FREMONT et al., Defendants.**

**GREATER SANDUSKY, INC., Plaintiff,**

v.

**CITY OF SANDUSKY et al., Defendants.**

Nos. C 65–211, C 65–209.

United States District Court
N. D. Ohio, W. D.

Dec. 30, 1968.

J. Edward Goff, J. Eugene Farber, Toledo, Ohio, for plaintiff.

Roger H. Smith, Toledo, Ohio, for defendants.

## OPINION

DON J. YOUNG, District Judge.

These cases came before the Court on motions of the plaintiffs for injunctions against the respective defendants to prevent the enforcement of certain ordinances against the plaintiffs. The cases have been consolidated for consideration since they present essentially the same questions and factual situations. The cases have been submitted to the Court upon stipulations of fact and are now ready for resolution of the dispute on the merits.

At the time of the commencement of this suit both of the plaintiffs were corporations organized under the laws of Ohio. In December, 1966, the two corporations were merged into Wonderland Ventures, Inc., a Michigan Corporation licensed to do business in the State of Ohio.

Plaintiffs seek to bring to the citizens of Sandusky, Ohio and Fremont, Ohio, respectively, the services of a community antenna television system (hereinafter referred to as CATV). These systems would take, from the air, television signals from the States of Pennsylvania, Michigan, Ohio, and the Province of Ontario, Canada, and relay them to the Sandusky and Fremont areas. The signals would then be distributed to the subscribers via the facilities of the Ohio Bell Telephone Company. Ohio Bell would add such facilities to its existing equipment as necessary and would pro-

vide service for an initial fee for installation and a regular monthly rental.[1] Thereafter, on May 21, 1965, plaintiff Greater Fremont paid Ohio Bell $31,299.-00 on its contract; and plaintiff Greater Sandusky paid Ohio Bell $37,139.00 on its contract. Plaintiffs then rented space in the two cities from which to sell and service the CATV systems and also acquired sites for the construction of antenna towers and other necessary "head-end" equipment.

The ordinances in question were passed by Sandusky on September 13, 1965, with amendments of September 27, 1965 and January 24, 1966; and by Fremont on September 23, 1965. Both ordinances purport to regulate CATV systems by means of a franchise system. Copies of the ordinances are attached to the respective stipulations of facts. At the time of the passage of these ordinances, work had been commenced by Ohio Bell and some of the necessary equipment was already installed. Both cities have advised the plaintiffs that should they proceed with the installation of these systems they would be prosecuted under these ordinances. It has further been stipulated that the respective plaintiffs would be prosecuted for failure to comply with the respective ordinances. The plaintiffs seek to have the enforcement of the ordinances against them permanently enjoined.

Before proceeding to consider this case on the merits, it is necessary to determine whether this Court has jurisdiction over the controversy. Plaintiffs have alleged that jurisdiction lies under 28 U.S.C. § 1337 and under 28 U.S.C. § 1331. Defendants deny that this Court has either jurisdiction over the subject matter or power to grant the relief requested.

■ Under 28 U.S.C. § 1337, this Court is given jurisdiction over an "[original] action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." It is clear that CATV systems are under the jurisdiction of the Federal Communications Commission, United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), and one of the major questions presented in this case is whether the FCC has preempted regulation of CATV systems from the states under the doctrine of Cooley v. Board of Wardens of Port of Philadelphia, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851).

■ Where a substantial federal question is raised, the federal court has jurisdiction to determine any state claims involved which arise from the same operative facts. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Massachusetts Universalist Convention v. Hildreth & Rodgers Co., 87 F.Supp. 822 (D.C.Mass.1949), aff'd, 183 F.2d 497 (1st Cir. 1950). Since the facts essential to determine whether the FCC has preempted this type of regulation and those necessary to determine the validity of these ordinances are essentially the same, this Court has jurisdiction over the entire controversy.

■ This Court also has jurisdiction under 28 U.S.C. § 1331 since the controversy involves questions of whether the plaintiff corporations are being denied due process and the equal protection of the laws as guaranteed by the Fourteenth Amendment of the Constitution of the United States.

■ The next question is whether this Court, having jurisdiction over the disputes, has the power to grant the relief prayed for. The general rule is that a federal court will not enjoin the enforcement of state criminal statutes or municipal ordinances unless there is clearly an irreparable injury to the plaintiffs and that forcing the plaintiffs to attack the validity of the statute in a criminal proceeding is a viable alternative. Outdoor American Corp. v. City of Philadelphia, 333 F.2d 963 (3rd Cir.),

1. A schedule of these rates was filed with the Public Utilities Commission of Ohio.

cert. denied, 379 U.S. 903, 85 S.Ct. 192, 13 L.Ed.2d 176 (1964). It is clear, however, that the prayer of the petition in these cases is in reality one for declaratory relief under 28 U.S.C. § 2201, Rule 57, Federal Rules of Civil Procedure, with the prayer for injunctive relief as a prayer for further proper relief under 28 U.S.C. § 2202. It is clearly within the power of this Court to so proceed. Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

■ Considering the length of time that the cases have been in this Court and the fact that this Court is now in a position to dispose of the matter, and since it is clear from the trial briefs that the defendant in fact is considering the case as being solely one of the validity of the ordinances, the Court will consider the prayer as one for declaratory relief.[2]

Before proceeding to consider the issues on the merits it might be well to consider the nature of CATV. A physical description of its essential operation has previously been sketched. At the danger of being slightly repetitious, CATV is a system whereby various electromagnetic waves are received by a central antenna, are amplified and then are distributed via cable to the subscribers of the company. As the name implies the signals are usually, but not necessarily, television signals. Each individual within the class of prospective subscribers can make a choice as to whether or not to subscribe to the service.

Depending upon the point of view taken, the criteria employed, and the particular system in question, CATV can be placed into different pre-existing categories. A discussion of some of these will be helpful in resolution of this dispute.

■ The first category into which some CATV systems can be placed is that of the maintainer of a distribution system. The characteristics essential for this classification are the erection of poles or the laying of conduits and the stringing of cable. It is of little consequence whether this is done over private or public right of way. When a CATV system so undertakes to maintain its own distribution system, it is analogous to the telephone, electric, gas, water and other companies that do likewise. As such, it is subject to the same kind of regulation as are these companies when the reasons for those regulations apply to it. [3]

■ Not all CATV systems choose to erect and maintain their own distribution systems. When they do not, they contract with someone already maintaining a system suitable for handling CATV to transmit the signals from the antenna to the "head-end" equipment and from the "head-end" equipment to the subscribers. Usuaully such a contract is made with a telephone company.[4] When

2. There can be no question that there is a controversy before the Court and that the matter is justiciable and ripe for decision. The nature of the claims presented, the length of time that it has taken to frame the issues in this case, the fact that final resolution of this controversy would be greatly delayed if the cause were remanded, and the fact that the defendants will not be prejudiced in any way, enter into the determination that there is sufficient good cause for the Court, in its discretion, to consider this action as one for declaratory relief and as such, to entertain it. See, cf. Yellow Cab Co. v. City of Chicago, 186 F.2d 946 (7th Cir. 1951); Larson v. General Motors Corp., 134 F. 2d 450 (2d Cir.) (L. Hand), cert. denied,

319 U.S. 762, 63 S.Ct. 1318, 87 L.Ed. 1713 (1943); E. W. Bliss Co. v. Cold Metal Process Co., 102 F.2d 105 (6th Cir. 1939).

3. It should be made clear that just as the gas, water, electric and telephone companies are not subject to the same regulations because of inherent differences in their natures, so CATV should not be subject to the same regulations as any of them simply because it chooses to erect its own distribution system.

4. The fact that the contracting distribution system may have to modify or expand its facilities does not change the nature of the distributor. Today telephone companies carry far more than just "tele-

such a contract is made, the reasons for regulating CATV as if it were an electric, gas, water or telephone company cease to exist. The CATV company is not stringing wires or digging ditches or erecting poles so that the general problems which these activities present to the local residents are not present. Further, the contracting distribution system is not changing or substantially increasing its regular activities so that this as well is no cause for further regulation.

A second way in which CATV can be considered is as a disseminator of entertainment. In this role CATV can be compared to the theatre, television, radio, newspapers, magazines and music services. Each of these in its role as a media of entertainment helps to lighten the burden of daily routine. While these media vary from "hot" to "cold", to use the McLuhanise phrase, they serve exactly the same function, and no distinction should be drawn between these forms of entertainment for regulatory purposes unless there is some real basis for the distinction.

The third way in which CATV can be considered is as a communicator of news, thoughts, and ideas similar to a newspaper, television, radio, books, magazines, news wire services, etc. It differs from these only in that it is *always* a secondary source of these items of news, thoughts, and ideas, since it is only repeating what is presented on television.

Nonetheless, it is presenting the news, thoughts and ideas that appear on television, and disseminating them to some individuals who would be unable to receive them without the aid of CATV.

When we consider CATV in this role, we are approaching the areas of freedom of speech and of the press protected by the First Amendment. In this area, the courts must always be alert to prevent improper encroachment by governmental regulations having no real basis in the public interest.

Finally, we must consider CATV as an economic unit. Unlike water, gas and electric companies where there is great public inconvenience in having numerous concerns serving the same geographical market, CATV is not a natural monopoly. There is only the inconvenience of having another pair of wires, if that, involved in having an additional CATV company in a geographical market.[5] Thus, the scope of regulation which is necessary in the natural monopolies is not here necessary.

Likewise, the economic factors which necessitate the regulation of the rates of the natural monopolies are not here present. For the purpose of analyzing the behavior of CATV rates in the market, we shall assume that the radio and television stations will continue to broadcast their signals via air waves, which is not too great an assumption.

In theory, the consumer will spend his dollar so as to derive the maximum of

---

phone calls" through their systems. Computers, radio, television, teletype, music, and wirephoto services all use the telephone system for distribution or transmission on a temporary or permanent basis. The signals of any of these, including CATV, being extremely similar, do not place a significantly different burden upon the public in the form of more poles, cables or equipment. In fact, the more constant use which such services make of the telephone system tends to maintain or lower telephone rates since the cost of maintenance can be more widely spread.

5. One must remember that a cable is capable of carrying as many messages as

pairs of wires in the cable can be created. The formula for determining the number of pairs is $n \times (n-1) = P$, where n is the number of wires in the cable and P the total number of pairs. Thus, a cable with 12 wires can in theory carry 132 messages at the same time. While practical considerations such as the electromagnetic field created by a current moving through a wire and its destructive effect on currents in parallel wires may limit the number of pairs and the distance of separation necessary to maintain any particular distribution system, nonetheless, 132 CATV systems, each entirely independent of all the others, could in theory be carried in a cable the size of one's thumb.

satisfaction or utility from his expenditure. Should he desire to erect a television receiving apparatus, commonly an antenna, at his home he can do so for a certain amount of money. The cost will vary given the difficulties in receiving stations in a particular locality and the type of antenna and auxiliary equipment such as rotors and amplifiers. This investment will last for several years, which we shall designate for convenience as Y number of years. The cost of the entire installation, C, divided by the expected life of the installation, Y, gives the annual or amortized cost of the installation, A or $C/Y = A$.

In most cases the CATV system will be able to provide more stations and better reception than the reception system which the individual would erect. This additional utility can be reduced, if somewhat imprecisely, to a dollar figure, which we shall designate as U. As long as the rate charged for the CATV service is less than A, most individuals would tend to subscribe rather than erect a reception system. This is true for the individual so long as the rate charged for the CATV service is less than A plus U. Since U will vary from individual to individual, the price will tend to stabilize at that point where the system can maximize its profits, which will be near but above the point where the rate of the CATV service equals A.

Now having some slight understanding of the nature of this new creature, CATV, we must concern ourselves with the question of whether the regulation of this creation has been preempted by the federal government, for if it has, the regulations of the cities must necessarily fall.

Community Antenna Television is enjoying a mushrooming growth that closely parallels that which took place in the regular television industry between 1950 and 1960. By the beginning of the sixties, there were over 550 identified CATV systems serving a total audience of almost two million people,[6] and by the end of 1965, there were almost 2,000 operating systems with another thousand in the process of getting set up for operation.[7] As the Federal Communications Commission has observed, " * * * CATV growth is clearly explosive in nature."[8] The Commission has not been unaware of the effect this growing industry necessarily has upon the broadcasting industry in general, and despite a failure to obtain an amendment to the Communications Act of 1934 which would have set forth the extent of its power over CATV, the FCC has gradually asserted jurisdiction over CATV, finding that "the likelihood or probability of adverse impact upon potential and existing service has become too substantial to be dismissed."[9] In 1962, the FCC conducted a rule-making proceeding in which it set forth two rules: first, CATV systems were required to transmit to their subscribers the signals of any station into whose service area they have brought competing signals, and second, CATV systems were forbidden to duplicate the programming of local stations during a period of 15 days before and after a local broadcast.[10] In a 1965 rule-making hearing, the FCC held that the Communications Act conferred adequate regulatory power over *all* CATV systems, and it proceeded to revise the rules governing the carriage of local signals and non-duplication of local programming, forbid the importation by CATV of distant signals into the 100 largest television markets except as already in operation on February 15, 1966, and created summary procedures for the disposition of applications for relief.[11] After two conflicting decisions had been rendered in the Circuit Courts of Appeal

6. Note, The Wire Mire: The FCC and CATV, 79 Harv.L.Rev. 366, 368 (1965–66).

7. Second Report and Order, 2 F.C.C.2d 725, 738. (1966).

8. Id., n. 15.

9. First Report and Order, 38 F.C.C. 683, 713. (1965).

10. Id. at 713–30.

11. Second Report and Order, *supra*, note 7 at 728, 764, 781.

as to whether the 1934 Communications Act conferred the power to regulate CATV which the FCC had declared it possessed, the United States Supreme Court took certiorari and decided, in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), that the FCC *has* authority under the 1934 Act to regulate CATV.[12]

There is therefore no doubt that the FCC has entered the field of regulating CATV, and that they have the power and authority to do so. The question then becomes, for purposes of the instant litigation, whether this entry has preempted the defendant municipalities from enforcing the ordinances in question. It is clear that the primary purpose behind the enactment of the 1934 Communications Act was to vest in a single governmental agency the power and means to regulate the broadcasting industry in such a comprehensive manner as to assure uniformity and constructive growth. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 137, 60 S.Ct. 437, 84 L.Ed. 656 (1940); Sablowsky v. United States, 101 F.2d 183, 189 (3rd Cir. 1938). In the Pottsville case, *supra*, the Court said 309 U.S. at page 137, 60 S.Ct. at page 438:

> In its essentials the Communications Act of 1934 derives from the Federal Radio Act of 1927. By this Act Congress, in order to protect the national interest involved in the new and far-reaching science of broadcasting, formulated a unified and comprehensive regulatory system for the industry.[13]

Now that the FCC has begun the regulation of CATV as well as regular television and radio, and their entry into the CATV field has been judicially approved,

it would seem to follow that all areas of CATV which parallel those in the regular television industry in their need for uniform treatment should be regulated only by the federal government, and not by the states. In a recent article referred to several times by the Supreme Court in its Southwestern Cable Co. decision, *supra*, the author notes the appropriateness of uniform FCC regulation of CATV as an alternative to state and local regulation, acknowledges the franchising activity being carried on by many cities, and concludes that this local regulation is of questionable validity.[14]

The article goes on to state:

> Not only does state regulation seem inappropriate for the CATV industry, but most of the field * * * may well be beyond the range of state control because of the Federal Communications Act. The Act indicates that it was intended to regulate "all interstate and foreign communication by wire and all interstate and foreign transmission of energy by radio," * * * Virtually all broadcasting—including CATV—is interstate in character. * * * Thus, given the broad scope of the Federal Act and the close relationship between CATV and regular TV broadcasting, it would seem that most regulation must come from the national government. * * * State establishment of rates and control over franchises could obstruct a desirable nationwide balancing of television service, and thus subvert whatever policy the FCC finally adopts. Indeed, even if Supremacy Clause preemption does not preclude state regulation in absence of federal regulation, preemption might come under the Commerce Clause, interpreted as a limit on state

12. This decision reversed the holding by the Ninth Circuit Court of Appeals in Southwestern Cable Co. v. United States, 378 F.2d 118 (9th Cir. 1967) that the 1934 Act did not confer such authority and gave its approval to Buckeye Cablevision, Inc. v. F.C.C., 128 U.S.App.D.C. 262, 387 F.2d 220 (1967), which had held the Act to permit such regulation.

13. For the legislative history of the Act of 1927, see H.Rep.No. 464, S.Rep.No. 772, 69th Cong., 1st Sess.; 67 Cong.Rec. 5473–504, 5555–86, 5645–47, 12335–59, 12480, 12497–508, 12614–18; 68 Cong.Rec. 1556–80, 2750–51, 2869–82, 3025–39, 3117–34, 3257–62, 3329–36, 3569–71, 4109–55.

14. Note, *supra* note 6 at 366.

action in those areas requiring uniform treatment.[15]

Of course, even a comprehensive system of federal regulation such as the Communications Act does not foreclose *all* state and local regulation, and it has been held that the 1934 Act does not preclude states from the exercise of their police powers in use of land and buildings, in the absence of regulations to the contrary.[16] Under the familiar doctrine enunciated in Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851), the states are not preempted from legislating areas not occupied by federal legislation, if the state legislation is not in conflict with, or repugnant to, the Congressional scheme. Therefore, although this Court believes that much of the state and local regulation of CATV will ultimately fall under the Supremacy Clause when the FCC continues to expand its regulatory efforts in the field, at the present time they have not occupied the area of franchising or rate-making,[17] and thus the two ordinances in question are not preempted by the 1934 Communications Act or federal agency regulation.

Having seen that the Federal Government has not preempted the regulation of CATV, we must turn to the question of whether the ordinances in these cases are valid. The ordinances are for all purposes the same with the exception that the Sandusky ordinance clearly attempts to regulate the rates to be charged and to prohibit the sale, lease, or repair of television receivers by the company. These two features will be considered separately at a later point. Also, the Fremont ordinance calls for payments to the city on a bid system whereby the CATV companies indicate what percentage of the receipts from the first thousand subscribers, what percentage from the second thousand, etc. the company will pay

to the city. The Sandusky ordinance calls for a flat percentage of all receipts from subscriptions to be paid to the city. These two "fees" will be considered together at a later point.

Putting aside these two parts and considering the basic skeleton of regulations, one finds that they purport to require a CATV company to obtain a franchise from the city before it can enter into business in the particular city, to post bond to save the city harmless from any accidents occurring from the operation of the CATV system, and to gain approval of the particular system before erecting a distribution system.

Neither of the ordinances nor the briefs of counsel make it clear under what authority the cities are claiming their power to regulate CATV. In considering this question, the Court believes that five possible bases for the authority must be considered.

As a general proposition it can be said that the totality of the power possessed by the municipal corporation in Ohio is that granted by the Constitution together with any proprietary powers which may reasonably be possessed by a municipal corporation. The basic grant of power is conferred upon the municipal corporations by Article XVIII, §§ 3 and 4 of the Ohio Constitution.

Article XVIII § 3 of the Ohio Constitution reads:

> Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limit such local police, sanitary and other similar regulations, as are not in conflict with general laws.

This grant has been construed to be of two parts: (1) all powers of local self-government and (2) such police, sanitary and other similar regula-

---

15. Id., at 373–74.

16. Koeger v. Stahl, 148 F.Supp. 403 (D. N.J.), aff'd, 248 F.2d 121 (3rd Cir. 1957).

17. In the 1965 proposed rule-making notice, the FCC stated that it did not

presently contemplate the regulation of CATV rates to subscriber or the award of CATV franchises. Docket 15,971; 30 Fed.Reg. 6073, 6083.

tions as are not in conflict with general law. The second clause does not modify the first, thus forming two complete and separate grants. Fitzgerald v. City of Cleveland, 88 Ohio St. 338, 103 N.E. 512 (1913). These grants do not necessarily contain all governmental powers since there are clearly some powers possessed by the state government which are not expressly granted or denied by this section. Village of Beachwood v. Board of Elections, 167 Ohio St. 369, 148 N.E.2d 921 (1958); State ex rel. Cherrington v. Hutsinpiller, 112 Ohio St. 468, 147 N.E. 647 (1925). Those powers which are granted are self-effectuating and the city need not adopt a charter to utilize these powers. Village of Perrysburg v. Ridgway, 108 Ohio St. 245, 140 N.E. 595 (1923).

■ The first possible basis for the ordinances in question is that the city has the power to incorporate those enterprises which desire to do business within it. Counsel does not urge this, and looking at Article XIII §§ 1 and 2, it is reasonably evident that the passage of laws of incorporation is one that is limited to the General Assembly. There is a sound question whether this is an exercise of the state police power, in which case Chapter 1701 of the Ohio Revised Code has preempted the field, or is some other power of government, but it is clearly not a power of local self-government and so cannot be exercised by a municipal corporation. Thus, if the ordinances are based upon this power, they are patently invalid.

What constitutes all powers of local self-government is one of the many questions presented in this case for which there is no definitive answer. No pretense is made that this opinion will serve as such. The internal organization of a municipal corporation is within the ambit of this grant of power. Fitzgerald v. City of Cleveland, *supra;* Hugger v. City of Ironton, 83 Ohio App. 21, 82 N.E. 2d 118 (1947). Likewise, the control, use, and ownership of most, but not all,

public property is such a power. Babin v. City of Ashland, 160 Ohio St. 328, 116 N.E.2d 580 (1953); Simmons v. Cleveland Hts., 81 Ohio Law Abst. 129, 160 N.E.2d 677 (Ct.C.P.1959).

In considering whether the regulations here in question can come under this grant of power, the Court has reviewed numerous authorities by all the courts of this state at every level. It is the considered opinion of this Court that this type of regulation can only be characterized as a police regulation. See, e. g. New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747 (1932); Tyson & Brother United Theatre Ticket Officers v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718 (1927); Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); Benjamin v. City of Columbus, 167 Ohio St. 103, 146 N.E.2d 854 (1957); Frecker v. City of Dayton, 153 Ohio St. 14, 90 N.E. 2d 851 (1950); Neil House Hotel Co. v. City of Columbus, 144 Ohio St. 248, 58 N.E.2d 665 (1944); City of Cincinatti v. Correll, 141 Ohio St. 535, 49 N.E.2d 412 (1943); Olds v. Klotz, 131 Ohio St. 447, 3 N.E.2d 371 (1936); City of Dayton v. S. S. Kresge Co., 114 Ohio St. 624, 151 N.E. 775, 53 A.L.R. 916 (1926).

Since it is clear from the construction given to Article XVIII § 3 of the Ohio Constitution, that something cannot be both a police regulation and a power of local self-government, we must conclude that this regulation is an exercise of the police power.

Just as it was impossible to discover a definition of powers of local self-government, so it is impossible to find a definition of the police power. A rudimentary definition would be that the police power is the power to control human behavior either for the general health, safety and welfare or in connection with the use of publicly owned or controlled property. The control must have as its basis the solution or prevention of some problem which it is a legitimate function of government to solve.[18]

18. One must realize that any attempt to define police power becomes bogged down in semantics and ambiguities. It is perhaps best to remember that the criminal

First considering the question of whether the ordinances can be based upon the control of behavior of CATV for the public health, safety and welfare [19] and whether the application of such to the plaintiff is valid, it is hard, if not impossible, to imagine any circumstances in which CATV would affect the public health to any greater extent than television, radio or movies. To draw a distinction here would be to create a class the distinction of which is patently unreasonable and arbitrary. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954).[20] Thus, the ordinances must be invalid in application to the plaintiffs if this is their basis.

■ Where the CATV company engages in the erection and maintenance of its own distribution system there is clearly a right to control these activities in the interests of public safety regardless of whether the system is erected on public or private property. The danger of falling poles or wires certainly is a proper subject of governmental action.

But where, as here, the CATV company does not enter into the erection and maintenance of its own distribution system, but contracts with a company already maintaining a system of poles and wires and which is already regulated in the interests of the public's safety, application of an ordinance controlling its operation and based upon the public safety could be arbitrary and discriminatory to the CATV company, as compared to the other media of dissemination of entertainment or communication of news, thoughts and ideas in violation of the equal protection clause of the fourteenth amendment to the United States Constitution. Thus, if the ordinances in question are based upon the public safety, they are clearly unconstitutional as applied to these plaintiffs.[21]

[17–19] The term public welfare is broad and general and its limits ill defined or undefinable. It is clear, however, that government cannot make the conduct of a legal business illegal simply because it may cause certain problems for the community. Adams v. Tanner, 244 U.S. 590, 37 S.Ct. 662, 61 L.Ed. 1336 (1917); Simon v. City of Cleveland Hts., 46 Ohio App. 234, 188 N.E. 308 (1933); City of Cincinatti v. Broadwell, 3 Ohio Dec.Reprint 286 (Ct.App.1855); Schul v. King, 70 N.E.2d 378 (Ct.C.P.Ohio 1946); Heller v. City of Cleveland, 37 Ohio L.Abst. 545, 10 Ohio Supp. 75 (Ct. C.P.1942). Cf. Tyson & Brother United Theatre Ticket Officers v. Banton, supra. Regulation of such a business is, of course, permitted so long as the regulation is directed towards solving the problems involved. Capital City Dairy Co. v. Ohio, 183 U.S. 238, 22 S.Ct. 120, 46 L.Ed. 171 (1902); Holsman v. Thomas, 112 Ohio St. 398, 147 N.E. 750 (1925); Allion v. City of Toledo, 99 Ohio St. 416, 124 N.E. 237, 6 A.L.R. 426 (1919); Scanning v. City of Cincinnati, 81 Ohio St. 142, 90 N.E. 125, 25 L.R.A.,N.S., 686 (1909); Motor Ins. Corp. v. Robinson, 62 Ohio L.Abst. 72, 106 N.E.2d 581 (Ct.App.1951); Schul v. King, supra. And where it is clear that the public danger is great enough the regulation can approach prohibition. Heller v. City of Cleveland, supra; Mo-

---

law, tariffs, anti-trust, zoning, and pure food and drug laws, not to forget wage and hour legislation, are all examples of the exercise of the police power.

19. One must remember that actions of a corporation are the collective actions of its shareholders, directors and agents and nothing more.

20. Equal protection of the laws requires that any classification which is made should be based on some real difference in light of the problem that is to be solved or prevented by the regulation. Perhaps the best statement of this rule is in Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) (Mr. Justice Holmes), although the particular classification therein involved might not be considered proper in light of present knowledge. This case also shows that to sustain a statute at least one valid purpose must be found.

21. See, note 3, *supra*.

tor Ins. Corp. v. Robinson, 62 Ohio L. Abst. 58, 106 N.E.2d 572 (Ct.C.P.), aff'd, 62 Ohio L.Abst. 72, 106 N.E.2d 581 (Ct. App.1951). Licensing is but a form of regulation (or taxation) and thus what cannot be done by direct regulation cannot be done under guise of licensing.

 Viewing the ordinances in question as being enacted under the police power of the municipalities to regulate or control activities for the public welfare, this Court is unable to find any other than an arbitrary basis for such regulation. This business is not sufficiently affected with a public interest to permit its regulation for the public welfare without a showing of some substantial need for such regulation. New State Ice Co. v. Liebmann, supra; City of Cincinnati v. Correll, supra; Olds v. Koltz, supra. No attempts are made to license the other media of entertainment or of communication news, thoughts, and ideas, and the classification of CATV as different from these for the purposes of regulation is arbitrary and discriminatory in violation of the equal protection clause of the fourteenth amendment of the United States Constitution.[22] Thus, if the ordinances are based upon the police power to protect the general welfare, they are unconstitutional as applied to the plaintiffs.

The other half of the police power is the power to regulate the use of publicly owned or controlled property. Particularly, this applies to the use of the streets to carry on business. The city clearly has the authority under the police power to make regulations regarding the use of the streets. Lorain St. R. R. v. Public Utilities Commission, 113 Ohio St. 68, 148 N.E. 577 (1925); Village of Perrysburg v. Ridgway, supra; Eastern Ohio Transportation Corp. v. Village of

Bridgeport, 44 Ohio App. 433, 185 N.E. 891 (1932). Generally, the regulation may not be a prohibition in fact. City of Nelsonville v. Ramsey, 113 Ohio St. 217, 148 N.E. 694 (1925).

A reading of the ordinances here in question with their provisions for placement of poles, stringing of cables and a bond to save the city harmless from any torts that the CATV company commits for which the city would otherwise be liable, leads the Court to believe that probably the city councils thought that they were acting under this power when the ordinances in question were passed.[23] Where the CATV company maintains its own distribution system which passes over, under or through the public highway right of way, it is clearly subject to the regulation of the municipality under this portion of the police power.[24] The ordinances in question would clearly be constitutional based upon this power when applied to a CATV company maintaining its own distribution system.

But such is not the case with both of the CATV companies herein involved. They have chosen to utilize the services of a distribution system which already occupies the streets and is thus already regulated. Thus, the CATV companies here involved do not enter into the streets any more than one who uses the telephone to transact business, or communicate with a computer. Thus, there is no basis for the application of these ordinances to the plaintiffs in this action under the police power to control the use of the streets, so that the ordinances are void in their application to these plaintiffs since municipalities in Ohio do not have power to regulate such activities under the power to regulate the use of the streets.

22. See, note 3, *supra.*

23. The only situation in which the city would be liable for the torts of the CATV company would be if the tort occurred in the CATV company's use of the streets since governmental tort immunity is removed in this instance by virtue of Ohio Revised Code § 723.01.

24. Thus, this Court clearly does not differ from the holding in DiBella v. Village of Ontario, 4 Ohio Misc. 120, 212 N.E. 2d 679 (Ct.C.P.1965), where the municipality was permitted to regulate a CATV system which was maintaining its own distribution system.

Further the regulations distinguish between CATV and the other media of entertainment and of communication of news, thoughts, and ideas which utilize the telephone lines to carry their messages, which is a distinction without a difference and thus a violation of the equal protection clause of the fourteenth amendment to the United States Constitution.[25] Thus, if the ordinances are based upon the power to regulate the streets, they are unconstitutional as applied to the plaintiffs.

Having seen that the ordinances in question cannot be sustained in their application to these particular plaintiffs under the grant of power contained in Article XVIII § 3 of the Ohio Constitution, our consideration must now turn to whether these ordinances can be sustained under the grant of power contained in Article XVIII § 4 of the Ohio Constitution:

Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the products or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company supplying to the municipality or its inhabitants the service or product of any such utility.

It has been held that this grant of power also includes the power to regulate the true public utilities, although such regulations being another manifestation of the use of the police power for the general welfare, they cannot be in conflict with general law. Cleveland Telephone Co. v. City of Cleveland, 98 Ohio St. 358, 121 N.E. 701 (1918); State ex rel. Klapp v. Dayton Power & Light Co., 10 Ohio St.2d 14, 225 N.E.2d 230 (1967).

Except for the fact that a public utility is sufficiently affected with a public interest to permit regulation, it is doubtful whether general agreement could be reached as to what constitutes a public utility. The common definition is:

A business organization deemed by law to be vested with a public interest usually because of monopoly privileges and so subject to the public regulation such as fixing rates, standards of service and provision of facilities. Websters New International Dictionary, 3rd Ed.

Since this definition defined a public utility in terms of what is subject to regulation, it is of no assistance to the Court.

Another definition which has been advanced and which will be accepted by this Court states that:

A public utility to the extent of its capacity is bound to serve those of the public who need the service and are within the field of its operations, at reasonable rates and without discrimination. * * * This duty does not permit such a public service corporation to pick out good portions of a particular territory, serve only selected customers and refuse service (*which it alone can give*) to the remaining portions of the territory and to other users. * * * Yet it is not a controlling factor that the corporation supplying service does not hold itself out to serve the public generally. It has been held that a business may be so far affected with a public interest that it is subject to regulation as to its rates and charges even though the public does not have the right to demand and receive service. Industrial Gas Co. v. Public Util. Comm'n of Ohio, 135 Ohio St. 408, 413, 21 N.E.2d 166, 168 (1939). (Emphasis added.)

The essential characteristics of this definition are that the public has a great interest and need to receive the services of the corporation or person and that for

---

25. See, note 3, *supra.*

reasons of practical necessity,[26] the operation of this type of business must occupy a monopolistic or ologopolistic position in the market.

The first of these two characteristics clearly is not present. The public has about as much real need for the services of a CATV system as it does for hand carved ivory back-scratchers. Even if in fact the CATV system is the only one in the market, it is not a monopoly in the economic sense as has been previously demonstrated. Thus CATV is not a public utility within the meaning of the definition that has been accepted.

But defendants urge that the definition of public utility is broader than that laid down in *Industrial Gas,* and cites as its basis for this the fact that an airport is a public utility.[27] Here again, the Court believes that the difficulty is one of semantics. It would appear that the term "public utility" has been used in two senses; (1) that which is truly a public utility as previously defined and discussed, and (2) that which the city can properly own and operate in its proprietary capacity.[28]

The things owned by a city are "public utilities" since the ownership and operation of them has been undertaken for the benefit and use of the general public. Usually, the particular services are adopted by the city to fill some great public interest or need in an area where it is felt that governmental ownership can produce better service. The basis for such ownership is not really under article XVIII § 4 of the Ohio Constitution but rather under article XVIII § 3 and the general proprietary powers of a municipality. There is no question that the city could establish and maintain a competing CATV system for the benefit of its residents. This power does not necessarily imply the power to regulate CATV however, just as it is clear that a city could own and operate a newspaper although it is unquestioned that this power would not give the city the power to regulate those already operating.

Thus, it is clear that the plaintiffs are not public utilities and cannot be regulated by the cities under the grant of power contained in article XVIII § 4 of the *Ohio Constitution* and that if the ordinances in question are based upon this power, they are void as applied to the plaintiffs.[29]

Thus, we have seen that the general regulation portions of the ordinances are not valid under either of the grants

---

26. The havoc of having numerous busses of different owners plying the same routes, or of having numerous telephone, gas, water, and electric companies serving the same area has been well demonstrated in urban history. Thus, it is necessary to give these services monopolistic or ologopolistic positions in a market with a rather inelastic demand necessitating economic regulation.

27. For authority on this point the defendants cite City of Toledo v. Jenkins, 143 Ohio St. 141, 54 N.E.2d 656 (1944) which states that for purposes of ownership an airport is a public utility, the court citing for its authority statutes permitting ownership of an airport, article XVIII § 4 (but why cite statutes if it is a utility within the meaning of that section unless it is only such by virtue of the statutes) of the Ohio Constitution, and the case of State ex rel. Chandler v. Jackson, 121 Ohio St. 186, 167 N.E. 396 (1929). In the Jackson case the Supreme Court quickly reasoned that an airport was a public utility because it had the power of eminent domain.

28. This distinction is further confused because the Ohio courts have said that the power to own something is within the grant of power under article XVIII § 3 of the Ohio Constitution, Simmons v. City of Cleveland Hts., 81 Ohio L.Abst. 129, 160 N.E.2d 677 (Ct.C.P.1959); cf. State ex rel. Gordon v. Rhodes, 156 Ohio St. 81, 100 N.E.2d 225 (1951), while other things are owned under the general proprietary powers of a municipal corporation. State ex rel. White v. City of Cleveland, 125 Ohio St. 230, 181 N.E. 24, 86 A.L.R. 1172 (1932).

29. The Court notes that the Public Utilities Commission of Ohio whose authority is approximately co-extensive with the definition of public utility which has been adopted has ruled that CATV is *not* a public utility within its jurisdiction. Application of Seneca Radio Corp., PUCO Case No. 32,646, P.U.R.3d 67 (1964).

of general power to municipal corporations, but this does not necessarily mean that the licensing system is not valid for other purposes. In this instance the only other valid purpose would be as a tax.

No citation is needed for the proposition that a license fee or rate can be a tax. The two ordinances here differ only in the way that they attempt to levy the tax. Defendant Fremont requires that all CATV companies submit to it a schedule of the amounts to be paid in the form of the percentage of the charges from the first thousand subscribers, a percentage from the second thousand, etc. Since this information must accompany the application for a license, it is necessarily implied that if city council does not like the percentage to be paid, it can refuse the license.

The tax which the city of Sandusky has by ordinance ordained is a flat percentage of the revenue of any CATV companies' operations in the city.

All taxes are levied upon the exercise of some privilege exercised by the taxpayer. In this instance, the privilege which is an incident of the tax is the privilege of doing business within the city. A tax with this incident is variously called a franchise tax, a capital stock tax, or a gross receipts tax, depending upon the measure of the tax, all of these laying upon the same incident.

The grant of power under article XVIII § 3 of the Ohio Constitution clearly includes the power to tax. State ex rel. Zielonka v. Carrel, 99 Ohio St. 220, 124 N.E. 134 (1919). However, the state can limit this power under articles XIII § 6 and XVIII § 13 of the Ohio Constitution. Where the state has enacted a tax on the same incident, in absence of a statute to the contrary, the state preempts any municipal taxing power on that incident. Haefner v. City of Youngstown, 147 Ohio St. 58, 68 N.E.2d 64 (1946), State ex rel. Zielonka v. Carrel, *supra*. The state has passed a franchise tax which is contained in Chapter 5733 of the Ohio Revised Code. Thus, the state has preempted this incident of taxation and for that reason, the taxes of the defendant are void if based upon that incident.[30]

The tax might alternatively have as its incident the privilege of earning income in the city and the amount of income as its measure. In more common terms, this would be an income tax. However, the tax also fails if it is based upon this incident because the state has exercised its powers under articles XIII § 6 and XVIII § 13 of the Ohio Constitution, regulating and limiting the passage of municipal income taxes to those that conform to Chapter 718 of the Ohio Revised Code, to which these ordinances do not conform.

While it is clear that a municipality, were there no state preemption, could levy a franchise tax, the law is likewise clear that the measure of the tax would have to be reasonably apportioned to the business carried on within the taxing jurisdiction. Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165 (1920). A tax that is not properly apportioned will fail. Fisher's Blend Station v. State Tax Commission, 297 U.S. 650, 56 S.Ct. 608, 80 L.Ed. 956 (1936). Here, both ordinances fail to distinguish between the charges received from doing business within the municipality and those without in determining the amount to which the percentages are to be applied. Thus, the tax is unapportioned and for that reason is invalid.

Finally, we reach the provisions of the Sandusky ordinance which purport to regulate the rates which may be charged by any CATV company operating within the municipality[31] and the attempt to

---

30. The fact that the measure of the state tax is different from the measure of the municipal tax is of no consequence.

31. The Fremont ordinance does not directly attempt to regulate rates. There is a provision in the ordinance that the rates to be charged are to be submitted in the application for a franchise. The city might attempt to regulate the rates by denying the franchise, but that would be a rather crude method of rate regulation.

prevent the CATV companies from engaging in the sale, leasing or repair of television sets.

The power to regulate rates is another manifestation of the exercise of the police power for the public welfare. It has long been recognized and is part of the common law. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1876). But without exception, each of the professions or services so regulated was reasonably necessary in every-day life or so inextricably bound to major segments of commerce that its rates could greatly influence the economy of the region.[32] Most, but not all, of the industries so regulated occupied a monopolistic or ologopolistic position in the economy as it then existed.[33] Our previous discussions have shown that this is not true in the case of CATV, which is perhaps one of the least necessary services imaginable.

■ Certainly the government can establish minimum rates to prevent unfair competition or maintain the operation of certain desirable services. Olin Mathieson Chemical Corp. v. Ontario Store of Price Hall, Ohio, Inc., 9 Ohio St. 2d 67, 223 N.E.2d 592 (1967); cf. City of Cleveland v. Public Util. Comm'n of Ohio, 100 Ohio St. 121, 125 N.E. 864 (1919). Likewise, the government can establish a maximum or price ceiling to prevent particular abuses. German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011 (1914); Dunn v. State, 122 Ohio St. 431, 172 N.E. 148 (1930); State v. Norval Hotel Co., 103 Ohio St. 361, 133 N.E. 75 (1921); Wessel v. Timberlake, 95 Ohio St. 21, 116 N. E. 43 (1916); Scanning v. City of Cincinnati, 81 Ohio St. 142, 90 N.E. 125, 25 L.R.A.,N.S., 686 (1909). But there must be a reasonably clear need for such economic regulation, State ex rel. Schneider v. Gullate Cleaning & Laundry Co.,

32 Ohio N.P. 121 (Ct.C.P.1934) and to put one class at a disadvantage is a denial of the equal protection of the laws. Serrer v. Cigarette Service Co., 148 Ohio St. 519, 76 N.E.2d 91 (1947).

The Sandusky ordinance fails on both considerations, the first being that as we have demonstrated, there is no need for regulation, and the second being that it singles out the rates of CATV to be regulated without regulating any of the rates charged by the other media of entertainment or of communication of news, thoughts and ideas. Thus, the regulation of rates is clearly invalid as applied to these defendants.

Finally, we come to the prohibition against any CATV company selling, leasing, or servicing television sets. The possibility of abuse in such activities is not readily apparent as it was in Motors Ins. Corp. v. Robinson, 62 Ohio L.Abst. 58, 106 N.E.2d 572 (Ct.C.P.), aff'd, 62 Ohio Law Abst. 72, 106 N.E.2d 581 (Ct.App. 1951). Unlike autos, the television manufacturers are not an ologopoly market and the plaintiffs have no relation to the television manufacturers. Thus, the classification of CATV to be prevented from selling, leasing, or servicing televisions arbitrarily distinguished CATV from the other media of entertainment or of communication of news, thoughts and ideas and as such, is invalid as a violation of the equal protection clause.

All other provisions of both ordinances only serve to implement the provisions which we have already discussed. And since the Court has been unable to find any basis upon which to uphold those provisions, all of the implementative provisions likewise must fail.

The Court hereby does declare that the application of the ordinances in question to the plaintiffs is invalid and under 28

---

However, as far as the city of Fremont attempts to regulate the rates by this ordinance, the discussion with reference to the Sandusky ordinance is applicable.

**32.** This is true because of the inelasticity of the demand for these services or products.

**33.** When considering the particular professions regulated one must remember that the limited transportation system of that period created a much smaller economic market than is present today.

U.S.C. § 2202 enjoins the defendants from enforcing these ordinances against the plaintiffs. An order will be entered accordingly and an injunction shall issue.