WHITE v CITY OF ANN ARBOR

WHITE v THE DETROIT EDISON COMPANY

Docket Nos. 60913, 60919. Argued November 15, 1978 (Calendar Nos. 9, 10).—Decided July 24, 1979.

Elmer E. White brought an action for a declaratory judgment that a City of Ann Arbor ordinance which authorized the granting of a cable television franchise was unconstitutional under the terms of the Constitution of 1963 because it did not state that the franchise was revocable at the will of the city or provide for an election to approve the franchise. The Washtenaw Circuit Court, Edward D. Deake, J., granted summary judgment for the plaintiff.

Elmer E. White brought an action for damages for trespass by Michigan CATV Associates in their use for a cable television system of public utility poles on an easement which runs across the plaintiff's property and for an accounting from The Detroit Edison Company for the payment made to it for the use of the poles. The Washtenaw Circuit Court, Edward D. Deake, J., granted summary judgment for the defendants on the ground that a cable television system is a "public utility" under the Subdivision Control Act of 1967. The cases were consolidated on appeal and the judgments affirmed in the Court of Appeals, Quinn, P.J., and V. J. Brennan and Bosman, JJ. (Docket Nos. 30308, 77-2136). The plaintiff and defendant City of Ann Arbor appeal.

In an opinion by Chief Justice Coleman, signed by Justices Kavanagh, Williams, Levin, Fitzgerald, and Ryan, it was *held:*

Although the term "public utility" is used in both cases, the

REFERENCES FOR POINTS IN HEADNOTES

[1-5] 16 Am Jur 2d, Constitutional Law §§ 64, 65, 71, 72, 75, 78.

73 Am Jur 2d, Statutes §§ 145, 146, 154, 155, 158, 159, 204-208.

[3, 5, 8, 9, 12, 13] 64 Am Jur 2d, Public Utilities §§ 1, 2.

[4] 16 Am Jur 2d, Constitutional Law §§ 83, 84.

[6, 7, 9, 11-13] 74 Am Jur 2d, Telecommunications §§ 185, 186.

Community antenna television systems (CATV) as subject to jurisdiction of state public utility or service commission. 61 ALR3d 1150.

[7, 8] 16 Am Jur 2d, Constitutional Law §§ 36, 38.

[10] [No Reference]

[11] 74 Am Jur 2d, Telecommunications, § 15.

provisions are directed to different problems which require different definitions of the term. The constitutional provision concerns the distribution of political power in municipal governments, and the Subdivision Control Act regulates the recording and development of land. The provisions of the Constitution do not apply to the granting of cable television franchises so as to require such a franchise which is not revocable at the will of the city to be approved by three-fifths of the electors. However, cable television is a "public utility" as that term is defined in the Subdivision Control Act of 1967, which permits an easement for a public utility to gain access to its customers in a subdivision.

1. The primary and fundamental rule of constitutional or statutory construction is the same in both cases. It is the duty of the Court to ascertain the purpose and intent expressed in the constitutional or statutory provision in question. Intent must be inferred from the language used, but it is not the meaning of the particular words in the abstract only or their strictly grammatical construction alone that governs. The words are to be applied to the subject matter and to the general scope of the provision, and they are to be considered in light of the general purpose sought to be accomplished or the evil sought to be remedied.

2. When the Constitution of 1963 was drafted the phrase "any public utility" used in art 8, § 25 of the Constitution of 1908 had been construed to mean only utilities supplying water, light, heat, power or transportation as specified in § 23. Presumably the delegates to the Constitutional Convention of 1961 were aware of the previous construction of the provision and courts will feel bound to adhere to it. There is nothing to indicate that the delegates to the 1961 Convention intended other than to incorporate a limited definition of "public utilities" into the new Constitution. There is nothing to show an attempt to expand the phrase or to apply it to privately funded franchises providing services unrelated to light, heat or power. To the contrary, the drafters reduced the enumerated utilities subject to its requirements by inserting the phrase "furnishing heat, light or power" after the phrase "any public utility".

3. The Address to the People supports this construction. The three-fifths majority of the electors required for purchase of a utility was continued because such a purchase implies commitment to a large investment of public funds and should not be lightly undertaken. There is no showing that the convention delegates intended to restrict further the right of municipalities

to grant franchises. Furthermore, the Constitution states that the powers granted to local governments shall be liberally construed in their favor.

4. A limited definition of "public utilities" as used in the Constitution is supported by considerations of public policy. Making franchises revocable at the will of the city would substantially increase the risks for those contemplating making large investments in such projects. In some cases the risk would deter or effectively prohibit entrepreneurs from making the investment. The risk is especially significant in broadcasting projects where public sentiment is susceptible to great fluctuation and might turn against a franchisee, for example, because of a controversial program or an editorial comment. Revocation of the broadcasting franchise at will also would raise the possibility of a First Amendment challenge. On the other hand, requiring an election for all types of privately funded services to the public, including cable television, not only would place a burden on the community but could prohibitively increase the risks and costs, or unduly delay the preparatory steps necessary for a franchisee to begin operations. Cities and franchisees have relied on the settled construction of this constitutional provision by making franchise agreements for cable systems for terms of years. They would stand to lose valuable services and millions of dollars if the previously settled construction of the Constitution were abandoned.

5. This construction of the constitutional provision allows the Legislature sufficient flexibility to attempt to resolve the issues of public concern. In the past, the Legislature has set up procedures for municipalities to follow in acquiring public utilities and improvements, and for granting public service franchises not explicitly mentioned in the Constitution. However, in the absence of any statutory procedures regulating the granting of cable television franchises, the municipal legislative body may, within the constitutional and statutory limits on its authority, provide for these franchises.

6. The phrase "any public utility franchise" as used in Const 1963, art 7, § 25, does not encompass cable television franchises.

7. The purposes of the Subdivision Control Act include furthering the orderly layout and use of land, and providing for proper ingress and egress to lots. The act defines as "public utilities" certain services which require the laying of pipes, implanting of poles and stringing of wires and "other services of a similar nature". The key to resolving the question is the word "similar". In this case cable television has the greatest similarity to telephone service among the services listed in the

act. The issue is not whether cable television service is the same as telephone service, but whether it is a similar service for purposes of carrying out the objectives of the Subdivision Control Act. Certainly differences do exist between the two services, but cable television service has informative and communicative aspects and potentials which are offered by telephone service, and the methods used to transmit these two services are very similar, *i.e.,* transmission of intelligence via electrical impulse.

8. Purveyors of public services are allowed access under the Subdivision Control Act to lots which might not otherwise be accessible in order to provide useful and desirable services. The act also provides for an orderly layout of the required facilities so as to avoid the use of unneeded, and sometimes unsightly, poles, cables, and wires.

9. Cable television is a "public utility" as that term is defined for the purposes stated in the Subdivision Control Act.

Justice Blair Moody, Jr., joined by Justice Kavanagh, concurred in the analysis and result in *Detroit Edison* and in the result in *Ann Arbor* but wrote separately to elaborate on certain considerations:

1. Although it is evident from the plain meaning of the words and from the history of the constitutional provision, art 7, § 25, that the definition of public utility for its purposes excludes cable television, it is imperative to recognize on a practical level that cable television possesses all the attributes of a public utility. While it may not cater to the physical needs of man as do utilities that provide heat, light, and power, it provides an equally important service in the rational, psychological, and esthetic growth of man, and furthermore is in its essence a de facto monopoly.

2. Because cable television portends a vast revolution in the broadcasting industry and because of the importance of the service it provides, it is essential that some form of regulation be provided to insure that the benefits of cable television be made available to the entire population. However commendable may be the provisions in local regulations, there is still a segment of the populace who will most likely be unable to avail themselves of the benefits of cable television, including the poor, the elderly, and those on fixed incomes in these inflationary-recessive times.

3. To insure equitable distribution of the benefits to be derived from cable television, it seems essential that some broad state-wide regulatory scheme be developed. The Public Service Commission has in the past declined to assume jurisdic-

tion over the cable television industry, but it is incumbent upon both the PSC and the Legislature to enter into the regulatory void that surrounds it to enhance the likelihood that all the public would enjoy the benefits of cable television.

Reversed as to *White v Ann Arbor.* Affirmed as to *White v The Detroit Edison Company.*

80 Mich App 346; 263 NW2d 367 (1977) reversed in part, affirmed in part.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — STATUTES — CONSTRUCTION — WORDS AND PHRASES.

The primary and fundamental rule of constitutional or statutory construction is that the Court's duty is to ascertain the purpose and intent as expressed in the provision in question; two provisions may employ the same term but have different meanings if they are directed to different problems.

2. CONSTITUTIONAL LAW — STATUTES — CONSTRUCTION.

The intent of a constitutional or statutory provision must be inferred from the language used, but it is not the meaning of the particular words in the abstract or their strictly grammatical construction alone which governs; the words are to be applied to the subject matter and to the general scope of the provision, and considered in the light of the general purpose to be accomplished or the evil sought to be remedied.

3. MUNICIPAL CORPORATIONS — PUBLIC UTILITIES — CONSTITUTIONAL LAW — WORDS AND PHRASES.

The term "any public utility" used in the constitutional provision restricting the right of a city to purchase a public utility or grant a public utility franchise had been authoritatively construed in the Constitution of 1908 as not applying to every public utility but only to those utilities supplying water, light, heat, power, or transportation, as specified in an accompanying provision (Const 1908, art 8, §§ 23-25; Const 1963, art 7, § 25).

4. CONSTITUTIONAL LAW — CONSTRUCTION — COMMON LAW — AMENDMENT.

A constitutional provision which has received a settled judicial construction and which is afterward incorporated into a new or revised constitution, or amendment, will be presumed to have been retained with a knowledge of its previous construction, and courts will feel bound to adhere to it.

5. CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS — PUBLIC UTILI-
    TIES — WORDS AND PHRASES — COMMON LAW.

   The drafters of the Constitution of 1963 carefully considered the
   previous judicial construction of the term "public utility" in
   drafting the new provision which restricts the right of a city to
   purchase a public utility or grant a public utility franchise;
   they reduced the enumerated utilities subject to its require-
   ments by inserting the phrase "furnishing heat, light or power"
   after the phrase "any public utility" (Const 1908, art 8, §§ 23-
   25; Const 1963, art 7, § 25).

6. TELECOMMUNICATIONS — CABLE TELEVISION — PUBLIC UTILITIES —
    CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS — STATUTES.

   A municipal corporation may, within the constitutional and
   statutory limits on its authority, provide for cable television
   franchises in the absence of any statutory procedures regulat-
   ing such grants (Const 1963, art 7, § 25).

7. TELECOMMUNICATIONS — CABLE TELEVISION — PUBLIC UTILITIES —
    CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS.

   The grant of a cable television franchise which is not revocable at
   will by a municipal corporation does not require approval by
   three-fifths of the electors under the Constitution (Const 1963,
   art 7, § 25).

8. CONSTITUTIONAL LAW — PUBLIC UTILITIES — CABLE TELEVISION.

   The phrase "any public utility" as used in the section of the
   Constitution requiring approval of a non-revocable public util-
   ity franchise by three-fifths of the electors of a municipal
   corporation does not encompass cable television (Const 1963,
   art 7, § 25).

9. EASEMENTS — PUBLIC UTILITIES — SUBDIVISION CONTROL ACT —
    LEGISLATIVE PURPOSE.

   Some of the purposes of the Subdivision Control Act include
   furthering the orderly layout and use of land, and providing for
   proper ingress and egress to lots for public utilities; the act
   defines as "public utilities" services which require the laying of
   pipes, implanting of poles and stringing of wires (MCL 560.101
   *et seq.;* MSA 26.430[101] *et seq.).*

10. WORDS AND PHRASES — SIMILAR.

   The word "similar" generally means that one thing has a resem-
   blance in many respects, nearly corresponds, is somewhat like,
   or has a general likeness, to some other thing; it does not mean

identical in form and substance, although in some cases "similar" may mean "identical" or "exactly alike".

11. TELECOMMUNICATIONS — CABLE TELEVISION SERVICE — PUBLIC UTILITIES — SUBDIVISION CONTROL ACT.

Cable television service is not identical to telephone service, but it is a "similar service" within the meaning and purpose of the Subdivision Control Act which permits an easement for the service to gain access to its customers in a subdivision (MCL 560.102[1]; MSA 26.430[102][1]).

CONCURRING OPINION BY BLAIR MOODY, JR., J.

12. TELECOMMUNICATIONS — CABLE TELEVISION — PUBLIC UTILITIES.

*Cable television possesses, on a practical level, all the attributes of a public utility; whether it is analyzed in terms of "usefulness" or "practical necessity", it is clear that cable television provides a service that is important to the public, and it operates as a de facto monopoly (Const 1963, art 7, § 25).*

13. TELECOMMUNICATIONS — CABLE TELEVISION — REGULATION — PUBLIC UTILITIES.

*It is incumbent upon both the Public Service Commission and the Legislature to enter into the regulatory void that surrounds cable television; since cable television is truly a public utility, state-wide regulation would enhance the likelihood that its benefits would be equitably distributed and that all the public would enjoy them.*

*White & Carter* for plaintiff.

*R. Bruce Laidlaw,* City Attorney, for defendant City of Ann Arbor.

*James J. Daskaloff* and *Thomas P. Beagen* for defendant The Detroit Edison Company.

Amici Curiae:

*G. Douglas Walton,* Deputy City Attorney, for City of Grand Rapids.

*Hogan & Hartson* (by *Gary L. Christensen, R. Clark Wadlow,* and *Stephen A. Goldberg)* and

*Mark A. Latterman, P.C.,* for Continental Cablevision of Michigan, Inc.

*Fraser, Trebilcock, Davis & Foster* (by *Michael E. Cavanaugh, David E. S. Marvin,* and *Ronald L. Jacobs)* for Michigan Cable Television Association.

*Stuart F. Feldstein, Michael B. Isaacs,* and *M. Thomas Hendrickson* for National Cable Television Association, Inc.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Robert D. Dunwoodie, Dennis M. Wilt,* and *Carolyn D. Bell)* for Teleprompter Corporation.

COLEMAN, C.J. The two subject cases were consolidated in the Court of Appeals because both involve cable television and the meaning of the term "public utility" as that term is used in certain constitutional and statutory provisions.

We granted leave in *White v City of Ann Arbor* to resolve the issue of whether a city ordinance which authorized the granting of a cable television franchise was unconstitutional under Const 1963, art 7, § 25 because the franchise was (1) not revocable at the will of the city nor (2) approved by three-fifths of the electors. We hold that § 25 does not apply to cable television franchises.

We granted leave in *White v Detroit Edison* to determine whether a cable television franchise can utilize Detroit Edison poles on property designated as a "public utility easement" pursuant to the Subdivision Control Act of 1967, MCL 560.190; MSA 26.430(190), to gain access to its subscribers in the subdivision. We hold that it can.

Initially, it should be noted that although both of these cases involve cable television and the term "public utility", the provisions in issue in each

case are different. Const 1963, art 7, § 25 is a constitutional provision concerning the distribution of political power in municipal governments. The Subdivision Control Act of 1967, on the other hand, is a statutory enactment regulating the recording and development of lands and subdivisions. (Other statutes regulating services for different purposes employ divergent definitions and terms.)[1] Each provision and definition is directed to a different problem and was drafted with a different goal to be achieved.

However, this Court's duty is similar in both cases. The primary and fundamental rule of constitutional or statutory construction is that the Court's duty is to ascertain the purpose and intent as expressed in the constitutional or legislative provision in question. Also, while intent must be inferred from the language used, it is not the meaning of the particular words only in the abstract or their strictly grammatical construction alone that governs. The words are to be applied to the subject matter and to the general scope of the provision, and they are to be considered in light of the general purpose sought to be accomplished or the evil sought to be remedied by the constitution or statute. See *General Motors Corp v Erves (On Rehearing)*, 399 Mich 241, 255; 249 NW2d 41 (1976) (opinion by COLEMAN, J.). Using these well recognized rules of construction and understanding that the provisions in question were directed to different areas of concern, we examine those provisions at issue herein.

## I

The plaintiff in each case is the same resident

---

[1] See fn 2, *infra.*

and taxpayer of the City of Ann Arbor (City). The City entered into a contract with Michigan CATV Associates (CATV) for a specific term of years subject to certain provisions. The cable television enterprise in turn entered into a contract with Detroit Edison Company to string its cable on the poles owned and previously implanted by Detroit Edison. Some of these poles are placed in a public utility easement which runs across plaintiff's property.

II

*White v City of Ann Arbor*

Plaintiff brought suit seeking a declaratory judgment which would hold that a city ordinance which authorized the granting of a cable television franchise was unconstitutional because it did not state that the franchise was (1) revocable at the will of the city, or (2) provide for approval of the franchise by three-fifths of the city electors.

The trial court granted plaintiff's motion for summary judgment, holding that a cable television system franchise is a public utility franchise within the provisions of § 25. The Court of Appeals affirmed, *White v Ann Arbor,* 80 Mich App 346; 263 NW2d 367 (1977). Defendant appeals, claiming that the Court of Appeals erred in holding that the requirements of § 25 apply to cable television franchises.

Const 1963, art 7, § 25 provides:

"No city or village shall acquire any public utility furnishing light, heat or power, or grant any public utility franchise which is not subject to revocation at the will of the city or village, unless the proposition shall first have been approved by three-fifths of the electors voting thereon. No city or village may sell any

public utility unless the proposition shall first have
been approved by a majority of the electors voting
thereon, or a greater number if the charter shall so
provide."

## A

On appeal, defendant argues that cable televi-
sion is not a public utility in the general sense of
the word.[2]

Because of definitional variations appearing in
the statutes and lack of specific definition in the
Constitution, and because it is not necessary to
reach such a definition for the purposes of this
opinion, we do not address that issue.[3]

[2] The problem of how to define "public utility" has puzzled the
Legislature and the courts for at least a century. Constitutional
writers and legislatures have included different activities within the
term. This is understandable if we consider the term as it is applied
to specific objectives of the various laws.

For example, in contrast to the Subdivision Control Act, note also
the act governing the obstruction of and encroachment on highways,
MCL 247.171 et seq.; MSA 9.251 et seq., particularly MCL 247.183-
247.185; MSA 9.263-9.265. By a 1972 amendment, the words "and
cable television companies" were added after the words "public utility
companies". The statute reads: "[t]elegraph, telephone, power, and
other public utility companies, and cable television companies". (Em-
phasis added.) The Legislature specifically designated cable television
as something other than a public utility which was required to obtain
the consent of a governmental unit to place poles, string wires, etc. in
public areas.

See also MCL 460.111 et seq.; MSA 22.84(1) et seq., which controls
the assessment of the costs of regulating public utilities. Cable televi-
sion is not regulated by the Michigan Public Service Commission.

On the other hand, see MCL 460.701 et seq.; MSA 22.190(1) et seq.,
which was enacted to protect underground facilities during construc-
tion activities. For the purposes of those regulations a potpourri of
activities, including cable television facilities, are included within the
definition of "public utility".

[3] The issue of whether cable television service is a public utility for
constitutional due process purposes, see 6 Michigan Law and Practice,
Constitutional Law, §§ 245-246, pp 204-206, was argued by both par-
ties. However, we do not need to address this issue to resolve this
case. The provisions of § 25 do not apply to all public utilities but
rather they apply only to the utilities enumerated in § 25. Since the
utilities mentioned do not include cable television, the provisions of
§ 25 do not apply to cable television.

The dispositive question addressed is the claim of the City that the requirements of Const 1963, art 7, § 25 were not intended by the drafters to apply to cable television franchises, but only to "any public utility furnishing light, heat or power".

Mr. White argues, to the contrary, that the language of § 25 refers to "any public utility franchise" and that this should be construed to mean any and all public utility franchises, so it should not be limited to those relating to the preceding words "any public utility furnishing light, heat or power". Necessarily, he maintains that cable television is a public utility.

In *Holland v Clerk of Garden City,* 299 Mich 465; 300 NW 777 (1941), the Court held that a sewage treatment system was not a public utility within the provisions of Const 1908, art 8, § 23[4] and § 25, the latter being the predecessor to the present Const 1963, art 7, § 25. See, also, *Mayor of Port Huron v City Treasurer of Port Huron,* 328 Mich 99; 43 NW2d 77 (1950). Section 23 provided that "any city * * * may acquire, own and operate * * * public utilities for supplying water, light, heat, power and transportation". Section 25 provided:

"Nor shall any city or village acquire any public

---

[4] Const 1908, art 8, § 23 provided:

"Subject to the provisions of this constitution, any city or village may acquire, own and operate, either within or without its corporate limits, public utilities for supplying water, light, heat, power and transportation to the municipality and the inhabitants thereof; and may also sell and deliver heat, power and light without its corporate limits to an amount not to exceed 25 per cent of that furnished by it within the corporate limits, and may also sell and deliver water outside of its corporate limits in such amount as may be determined by the legislative body of the city or village; and may operate transportation lines without the municipality within such limits as may be prescribed by law: *Provided,* That the right to own or operate transportation facilities shall not extend to any city or village of less than 25,000 inhabitants."

utility or grant any public utility franchise which is not subject to revocation at the will of the city or village, unless such proposition shall have first received the affirmative vote of 3/5 of the electors * * *."

In *Holland, supra,* the Court interpreted the term "public utility" so that it did not encompass every public utility but, rather, so that it applied only to utilities supplying water, light, heat, power and transportation as specified in § 23. The reason for this construction was that the functions listed in Const 1908, art 8, § 23 were definite and were described as public utilities.[5]

Thus, when Const 1963, art 7, § 25 was drafted, the phrase "any public utility" had already been authoritatively construed by the Court to mean utilities supplying water, light, heat, power or transportation. Presumably the delegates to the Constitutional Convention were aware of this construction. In *Richardson v Secretary of State,* 381 Mich 304, 311; 160 NW2d 883 (1968), the Court discussed rules of constitutional interpretation and stated:

" 'Where a constitutional provision has received a settled judicial construction, and is afterward incorporated into a new or revised constitution, or amendment, it will be presumed to have been retained with a knowledge of its previous construction, and courts will feel bound to adhere to it.' 16 CJS, Constitutional Law, § 35, pp 114-115."

There is nothing to indicate that the delegates to the 1961 Convention intended other than to

---

[5] The drafters of the Constitution of 1963 in apparent recognition of *Holland* provided for sewage disposal in § 24 which has to do with "public service facilities". The Convention Comment notes that sewage disposal is therein recognized as a public service facility. 2 Official Record, Constitutional Convention 1961, p 3393.

incorporate a limited *Holland-* type definition of public utilities into § 25. There is nothing to indicate that the 1961 delegates attempted to expand the *Holland* construction or apply it broadly to include privately funded franchises providing services unrelated to light, heat or power. To the contrary, the drafters carefully considered the *Holland* construction when drafting the new § 25 and reduced the enumerated utilities subject to its requirements by inserting the phrase "furnishing light, heat or power" after the phrase "any public utility".[6]

As this Court did in *Holland, supra,* 470-471, we adhere to the standard set forth in *Pfeiffer v Board of Education of Detroit,* 118 Mich 560, 564; 77 NW 250 (1898):

" 'In determining this question, we should endeavor to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time * * * ' "

This construction is supported in relevant part by the Convention Comment to Const 1963, art 7, § 25. The comment states:

"This is a revision of Sec 25, Article VIII, of the

---

[6] One reason these utilities were specifically mentioned in Const 1963, art 7, § 25, was that the provisions of Const 1908, art 8, § 23 (which, in part, listed the utilities concerned and which was relied on in *Holland)* were scattered in the 1963 Constitution. Since the applicable services were no longer described as public utilities in § 23, the phrase "furnishing light, heat or power" was inserted in § 25. The applicable utilities were also reduced in number. A memorandum dated March 21, 1962, to the Chairman of the Committee on Style and Drafting from four members of the Committee on Local Government recommended that the word "water" be deleted from the phrase "any public utility furnishing water, light, heat and power". This recommendation was made on the basis that the committee only intended that § 25 restate the 1908 practices. Accordingly, the word "water" was deleted from § 25.

present [1908] constitution. Language in the first sentence relating to the elective franchise has been transferred to Article II, and provisions concerning credit are now covered in another section of this Article.

"The words 'furnishing light, heat or power' are added to the second sentence to define the power of municipalities to acquire utilities. *The three-fifths majority required for purchase of a utility is continued because such purchase implies commitment to a large investment of public funds and should not be lightly undertaken.* The municipality should have sound assurance that the utility will be supported by its citizens." (Emphasis added.) 2 Official Record, Constitutional Convention 1961, p 3393.

Further, there is no indication that the convention delegates intended to restrict further the right of municipalities to grant franchises. Support for this conclusion can also be found in Const 1963, art 7, § 34 which states:

"The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor. Powers granted to counties and townships by this constitution and by law shall include those fairly implied and not prohibited by this constitution."

## B

This limited definition of the term public utilities as it is used in § 25 is supported by considerations of public policy.

The construction advanced by plaintiff might unduly hinder the municipalities' ability to attract and grant franchises. Making franchises revocable at the will of the city would substantially increase the risks for those contemplating making large

private investments in such projects. In some cases, this risk would be so great as to deter or effectually prohibit entrepreneurs from making these investments. This risk of uncertainty is especially significant in sensitive areas such as broadcasting where public sentiment is susceptible to great fluctuations and could easily turn against a franchisee as a result of an error on its part, because of a controversial production or because an editorial comment was not to the liking of some. Revocation at will also raises the possibility of a First Amendment challenge.

On the other hand, requiring an election for all unspecified privately funded services to the public, including cable television, not only would place a burden on the community but could prohibitively increase the start-up risks and costs or unduly delay the preparatory steps necessary for any such franchisee to begin operations. With some sound reasoning, *amici* argue that cable television enterprises would be discouraged from starting or expanding in Michigan and that the enterprises already present could hold void franchises after making large private investments if the provisions of § 25 are held to apply to cable television franchises.

Historically, cities and franchisees have relied on *Holland.* The cities, by granting franchises for cable television systems for terms of years, and the franchisees, by investing millions of dollars and extensive service, have relied on what was believed to be a settled construction of the provisions of § 25. These cities, their residents and franchisees could stand to lose valuable services and unknown millions of dollars should we find plaintiff's arguments to prevail and abandon the settled construction.

## C

Importantly, this construction of Const 1963, art 7, § 25 allows the Legislature sufficient flexibility in attempting to resolve the issues of public concern. In the past, the Legislature has set up procedures for municipalities to follow in acquiring public utilities and improvements and for granting public service franchises not explicitly mentioned in Const 1963, art 7, § 25. However, in the absence of any statutory procedures regulating the granting of cable television franchises, the duly authorized legislative body in the municipality may, within the constitutional and statutory limits on its authority, provide for these franchises. The provisions of Const 1963, art 7, § 22 and § 34 support this construction of § 25.

## D

In summary, we hold that the provisions of Const 1963, art 7, § 25 do not apply to the granting of cable television franchises so as to require that any franchise which is not revocable at the will of the city be approved by three-fifths of the electors. The provisions in § 25 were derived from the provisions of Const 1908, art 8, § 25. Those provisions were construed in *Holland* as applying only to the services listed in Const 1908, art 8, § 23. When the Constitution of 1963 was drafted, the delegates were presumably aware of the *Holland* construction and they incorporated a similar limited definition into the new § 25.

The concerns advanced by plaintiff are not sufficient to justify departing from the settled construction of the phrase "any public utility" in § 25 given *Holland, supra,* and incorporated in part in Const 1963, art 7, § 25. Accordingly, we hold that

the phrase "any public utility" as used in Const 1963, art 7, § 25 refers to the enumerated utilities only. It does not encompass cable television franchises.

### III

### *White v Detroit Edison*

#### A

Plaintiff sought damages for trespass by CATV and for an accounting from Detroit Edison for all monies paid to it by CATV for the use of the poles in question. These claims were based on the theory that CATV had no right to utilize property designated as a public utility easement and that it had trespassed on plaintiff's property by stringing aerial wires from poles owned by Detroit Edison which were implanted in land designated as a public utility easement pursuant to the Subdivision Control Act of 1967, MCL 560.101 *et seq.;* MSA 26.430(101) *et seq.* The trial court granted defendants' motion for summary judgment holding that cable television is a public utility as that term is defined and applied in MCL 560.102*(l);* MSA 26.430(102)*(l)* and that CATV was entitled to use the poles under contract with Detroit Edison. The Court of Appeals affirmed and plaintiff applied for leave to appeal. Leave to appeal was granted and appeal limited to the issue of whether a cable television system is a "public utility" within the meaning of the Subdivision Control Act of 1967. We affirm.

#### B

MCL 560.102*(l);* MSA 26.430(102)*(l)* defines a public utility:

" 'Public utility' means all persons, firms, corporations, copartnerships or municipal or other public authority providing gas, electricity, water, steam, telephone, sewer or other services of a similar nature."

Cable television is not one of the services listed in subdivision *(l)*. Therefore, it can be a public utility for the purposes of the Subdivision Control Act only if it is an "other service of a similar nature" to one of those listed in the act. In interpreting this provision, this Court's duty is to construe it in such a manner as to carry out the intention of the Legislature. The most basic requirement of legislative intent requires that the words be read in light of the general purposes sought to be accomplished, *General Motors Corp v Erves, supra.* Some of the purposes underlying the Subdivision Control Act and listed in its preamble include: "to further the orderly layout and use of land" and "to provide for proper ingress and egress to lots", 1967 PA 288. The statute in question defines services which require the laying of pipes, implanting of poles and stringing of wires.

The key to resolving whether cable television is a public utility within the meaning of the act is the word "similar". A generally accepted definition of the word "similar" is stated in *Fletcher v Interstate Chemical Co,* 94 NJL 332, 334; 110 A 709 (1920), see also 17 ALR 94:

"The word 'similar' is generally interpreted to mean that one thing has a resemblance in many respects, nearly corresponds, is somewhat like, or has a general likeness, to some other thing, and not to mean identical in form and substance, although in some cases 'similar' may mean 'identical' or 'exactly alike' ".

This interpretation has been adopted in Michigan. See *Thomas v Consumers Power Co,* 58 Mich App

486, 494; 228 NW2d 786 (1975), *rev'd on other grounds,* 394 Mich 459; 231 NW2d 653 (1975). Of the services mentioned in subdivision *(l),* cable television has the greatest similarity to telephone service. In the instant case, we need not address the issue of whether cable television service is the same as telephone service. Instead, we consider whether cable television is a similar service for purposes of carrying out the objectives of the statute.

Certainly differences do exist between the services offered by cable television and telephones. Telephone service usually provides for the two-way transmission of articulate speech between any two or more terminal points in the system. Cable television, in its present state of technological development and implementation, does not currently provide these services. However, cable television service does have informative and communicative aspects and potentials. Also, the medium used to transmit these services is very similar to that used in providing telephone service. It is for these reasons that cable television has been analogized to telephone service. In *Re New York Telephone Co,* 34 PUR3d 115 (NY PSC, 1960), the commission stated:

*"It is quite apparent that principles common to telephony and telegraphy,* i.e., *transmission of intelligence via electrical impulse, will be employed in the transmission of television signals and associated audio signals* over the channels to be provided by the telephone company.

* * *

"Similarly, the telephone company by offering channels to an antenna company is offering to provide a communication service—a variety of telephony or telegraphy—and nothing else.

"The mere fact that at this stage of the development of this form of picture and sound transmission special coaxial cable and other special equipment must be installed in order to provide this particular service does not militate against the conclusion that the telephone company is providing telephone or telegraph service." (Emphasis added.)

Although cable television service is not identical to telephone service, we conclude that it is a "similar service" within the meaning of the Subdivision Control Act.

This construction of the Subdivision Control Act is consistent with the purposes underlying the act. It allows purveyors of such services an ingress to and access to lots which might not otherwise be accessible in order to provide useful and desirable services. It also provides for an orderly layout of the required facilities in these areas so as not to require the utilization of unneeded, and sometimes unsightly, poles, cables and wires.

Accordingly, we hold that cable television is a "public utility" as that term is defined for the purposes stated in the Subdivision Control Act of 1967.

Reverse in *White v City of Ann Arbor*. Affirm in *White v Detroit Edison*.

No costs, this being a public question.

KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, and RYAN, JJ., concurred with COLEMAN, C.J.

BLAIR MOODY, JR., J. *(concurring)*. I concur with the analysis and result reached by Chief Justice COLEMAN in *Detroit Edison*. I concur in the result reached in *City of Ann Arbor* but write separately to elaborate on certain important considerations

left unaddressed in Chief Justice COLEMAN's opinion.

Const 1963, art 7, § 25 reads:

"No city or village shall acquire any public utility furnishing *light, heat or power,* or grant any public utility franchise which is not subject to revocation at the will of the city or village, unless the proposition shall first have been approved by three-fifths of the electors voting thereon. No city or village may sell any public utility unless the proposition shall first have been approved by a majority of the electors voting thereon, or a greater number if the charter shall so provide." (Emphasis added.)

It is evident from the plain meaning of the words of this provision and from a review of the Official Record of the 1961 Michigan Constitutional Convention that the definition of the term "public utility" is limited to those utilities furnishing light, heat or power. Thus, for art 7, § 25 purposes, cable television is not a public utility.

Although this limited constitutional definition of public utility excludes cable television, it is imperative to recognize on a practical level that cable television possesses all the attributes of a public utility. While the term "public utility" has eluded precise definition, this Court has defined the term as follows:

"Utility means the state or quality of being useful. Was this plant [waterworks company] one useful to the public? If so, it was a public utility." *Schurtz v Grand Rapids,* 208 Mich 510, 524; 175 NW 421 (1919).

A Federal District Court has given a similar, if somewhat more expansive, definition by defining a public utility as a business which offers services for which the public has such a need as to consti-

tute a practical necessity and which by its very
nature is an economic monopoly. *Greater Fremont,
Inc v Fremont,* 302 F Supp 652, 664-665 (ND Ohio,
1968).

Whether cable television is analyzed in terms of
"usefulness" or "practical necessity", it is clear
that cable television provides a service that is
important to the public. The United States Su-
preme Court, in the context of a decision involving
cable television, has noted the importance of the
communication industry:

"[F]or broadcasting is demonstrably a principal
source of information and entertainment for a great
part of the Nation's population." *United States v South-
western Cable Co,* 392 US 157, 177; 88 S Ct 1994; 20 L
Ed 2d 1001 (1968).

While cable television may not cater to the physi-
cal needs of man as do utilities that provide heat,
light and power, it provides an equally important
service in terms of the rational, psychological and
esthetic growth processes of man. Further, as
many commentators so adroitly point out, cable
television is in its essence a de facto monopoly.[1]
Barnett, *Cable Television and Media Concentra-
tion, Part I: Control of Cable Systems by Local*

---

[1] Cable television for the most part originated in small communities
where network television was difficult if not impossible to receive.
Because of the expense of stringing cables on poles or burying them
underground and because of the exclusivity of the franchises ob-
tained, it was almost unheard of for two cable television operators to
exist within the same community. As cable television has rapidly
developed into large metropolitan areas, however, it is not unheard of
that several cable television operators can exist side by side. While
this might indicate that cable television no longer operates from a
monopolistic framework, at least as far as large cities are concerned,
there has recently developed a trend of consolidation of cable televi-
sion operators under one large umbrella or corporation. Thus, the
industry remains a functional monopoly. See Witt, *CATV and Local
Regulation,* 5 Cal Western L Rev 30, 39-40 (1968).

*Broadcasters,* 22 Stanford L Rev 221, 239 (1970); Note, *Regulation of Community Antenna Television,* 70 Columbia L Rev 837, 849 (1970).

Because cable television in its nascent state portends a vast revolution in the broadcasting industry and because of the importance of the service cable television provides, it is essential that some form of regulation be fostered to insure that the benefits of cable television be made available to the entire population. The City of Ann Arbor has taken steps in Chapter 32 of the Ann Arbor City Code to insure that the benefits of cable television reach a broad spectrum of the citizenry. Section 2:114(9) of Chapter 32 reads as follows:

> "The Grantee shall, without charge for installation, maintenance, or service make single installations of its standard community antenna services to the City Hall, each fire station in the City of Ann Arbor, each accredited public and private, elementary or secondary school in said City, and the Public Library. One such installation shall be provided for each Junior or Community College in said City and four (4) such installations for the University of Michigan. Such installations shall be made at such reasonable locations as shall be requested by the respective units of government or educational institutions."

However commendable this above provision may be, there is still a segment of the populace who will most likely be unable to avail themselves of the benefits of cable television. This includes the poor, the elderly and those on fixed incomes. In these inflationary-recessive times, it is not difficult to project that economic reality will prevent access to cable television on the part of these groups.

To insure equitable distribution of the benefits to be derived from cable television, it seems essential that some broad state-wide regulatory scheme

be developed. Although the Michigan Public Service Commission (PSC) has in the past declined to assume jurisdiction over the cable television industry, *City of Jackson v Michigan Bell Telephone Co*, 63 PUR3d 384 (Mich Public Service Commission, 1966), it is incumbent upon both the PSC and the Michigan Legislature to enter into the regulatory void that surrounds cable television. Since cable television is truly a public utility, state-wide regulation would certainly enhance the likelihood that the benefits of cable television would adhere to all the public.[2]

KAVANAGH, J., concurred with BLAIR MOODY, JR., J.

---

[2] While availability to the public has been stressed as the main reason for advocating a state-wide regulatory scheme, it is noted that there may be other important considerations which would favor a state-wide method as opposed to local regulation, *e.g.,* difficulty of local government units in setting fair rates. See Comment, *Federal, State, and Local Regulation of CATV—After You, Alphonse * * *,* 29 U Pitt L Rev 109, 119 (1967).