## BURK v WARREN

Docket Nos. 47885, 48909. Submitted June 9, 1980, at Lansing.—
Decided April 21, 1981. Leave to appeal applied for.

Robert D. Burk, a motorcyclist, collided with a truck owned and
operated by David O. Warren. Warren was insured by the
Detroit Automobile Inter-Insurance Exchange, as were Burk's
parents, with whom Burk lived. Burk carried no property
insurance coverage on his motorcycle. Burk suffered a fractured
clavicle and his motorcycle sustained damage. Burk brought an
action for damages, both for the injury and for the property
damage, against Warren and DAIIE. Burk and DAIIE stipu-
lated to entry of judgment against DAIIE on the property
damage claim, without prejudice to DAIIE's right to appeal.
Trial on the injury claim resulted in a jury verdict of no cause
of action, and judgment was entered on the verdict, Ingham
Circuit Court, Thomas L. Brown, J. It was found that Burk's
injuries did not amount to a serious impairment of body func-
tion.

Burk appeals from the trial court's denial of his motion for a
judgment notwithstanding the verdict or for a new trial. DAIIE
appeals from the court's award of property damage to Burk.
The appeals were consolidated. *Held:*

1. Under the no-fault statute an automobile owner may not
recover no-fault benefits for damage to his automobile unless it
was properly parked at the time of the accident. He may, if he
wishes, purchase collision coverage to insure his car against
damage. It is consistent with the intent and purposes of the no-
fault statute to presume that the Legislature intended a similar
result in the event of property damage to motorcycles. Simi-
larly, because tort liability for such property damage has been
abolished, a motorcyclist may not recover for property damage

REFERENCES FOR POINTS IN HEADNOTES

[1] 73 Am Jur 2d, Statutes §§ 145, 146.
[2] 7 Am Jur 2d (Rev), Automobile Insurance §§ 348, 349, 366.
 Validity and construction of "no-fault" automobile insurance plans.
   42 ALR3d 229.
[3] 7 Am Jur 2d (Rev), Automobile Insurance § 23.
[4, 5] 7 Am Jur 2d (Rev), Automobile Insurance § 358.

under the traditional tort remedy. Summary judgment in favor of DAIIE should have been granted with respect to the property damage claim.

2. The no-fault statute is remedial in nature and should be liberally construed in favor of accident victims. In this case the injury suffered, a broken clavicle with attendant loss of use of the arm and shoulder and limitation of mobility, was a serious impairment of body function as a matter of law. The temporary nature of the disability is not determinative of the seriousness of the injury, rather it is but one element to be considered in ascertaining the seriousness.

3. It is noted that the statute provides no guidance on the definitional parameters of the term "serious impairment of body function".

The trial court's denial of summary judgment as to the property damage is reversed and the matter remanded for entry of that judgment. The judgment of no cause of action on the injury claim is reversed and remanded for a new trial.

T. M. BURNS, P.J., concurred separately in the result on the authority of recent Court of Appeals decisions holding that motorcyclists are not entitled to no-fault property damage benefits.

1. STATUTES — JUDICIAL CONSTRUCTION.

The primary rule of constitutional or statutory construction is to ascertain the purpose and intent expressed in the constitutional or legislative provision in question.

2. INSURANCE — NO-FAULT INSURANCE — TORTS — MOTORCYCLES.

A motorcycle owner may not recover no-fault benefits for property damages caused to the motorcycle in a collision, nor is he free to pursue a traditional tort remedy because the no-fault law has abolished tort liability with respect to unintentionally caused property damage arising from the use, ownership, or maintenance of motor vehicles.

3. INSURANCE — NO-FAULT INSURANCE — REMEDIAL STATUTES.

The no-fault automobile insurance statute is remedial in nature and must be liberally construed in favor of accident victims.

4. INSURANCE — NO-FAULT INSURANCE — SERIOUS IMPAIRMENT OF BODY FUNCTION.

The length of time for recovery is not determinative, but is only one element to be considered in ascertaining whether a given injury amounts to a serious impairment of a body function

within the meaning of the no-fault automobile insurance statute.

5. INSURANCE — NO-FAULT INSURANCE — SERIOUS IMPAIRMENT OF BODY FUNCTION.

A fractured clavicle, from which, during the period of recovery, the injured party suffered greatly reduced use of his arm and shoulder thus limiting his mobility, amounts to a serious impairment of body function as a matter of law for the purposes of the no-fault automobile insurance statute (MCL 500.3135[1]; MSA 24.13135[1]).

*McKay, Roberts, Guerre & Whitmer, P.C.,* for plaintiff.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *C. Mark Hoover* and *Ronald R. Sutton),* for defendants.

Before: T. M. BURNS, P.J., and BEASLEY, and G. R. DENEWETH,* JJ.

G. R. DENEWETH, J. This matter encompasses two consolidated appeals of right arising from a single lawsuit.

On June 1, 1976, a motorcycle owned and operated by plaintiff, Robert D. Burk, collided with a pickup truck owned and operated by defendant David O. Warren. At the time of the collision, Warren was insured under a policy of no-fault automobile insurance issued by defendant DAIIE. Burk resided with his parents, who carried no-fault insurance coverage on their automobiles under certain policies also issued by DAIIE. Burk possessed no separate property insurance coverage on his motorcycle.

Litigation commenced in Ingham County Circuit Court on November 5, 1976. Burk joined his personal injury claims against Warren with claims

* Circuit judge, sitting on the Court of Appeals by assignment.

against DAIIE for the property damage occasioned to his motorcycle.

DAIIE's response to the complaint was in the form of a motion for summary judgment of dismissal in its favor. The motion asserted that Burk's claim concerning the property damage to his motorcycle was barred by the Michigan no-fault automobile insurance act. This motion was denied November 1, 1978.

Without waiving DAIIE's right of appeal, Burk and DAIIE stipulated to the entry of a judgment against DAIIE on the property damage claim.

Thereafter, on September 17, 1979, Burk's claims for his personal injuries were tried before a jury. On the following day, the jury returned a verdict of no cause of action. In reaching this conclusion, the jury responded to certain specific questions propounded by the trial judge. It was determined that the collision had been proximately occasioned by Burk's negligent operation of his motorcycle. It was further determined that Burk's injuries did not amount to a "serious impairment of body function".

Burk's injuries consisted of a fractured clavicle (collarbone) and numerous bruises and abrasions. The fracture was set by a closed reduction and Burk was placed in a brace cast for a period of one month. No untoward complications were present at any time during Burk's convalescence. The principal consequences of the injuries were pain, sleeplessness and greatly impeded physical activity. The latter factor was occasioned largely through the immobility of Burk's arm and shoulder while he was in the brace cast. The physician's prognosis indicates that no permanent damage of any consequence is present.

Burk's appeal rises from the trial judge's denial

of his motion for a judgment *n.o.v.* or, in the alternative, for a new trial. Because of Burk's failure to move for a directed verdict at any time, we will treat the matter as an application for a new trial only, GCR 1963, 515.2.

DAIIE's appeal flows from the trial judge's decision to award Burk $2,010.30 as compensation for the property damage occasioned to his motorcycle.

We will first analyze the question of property coverage. Under the no-fault act, a person is entitled to receive property protection insurance benefits to cover damages to his personalty occasioned by mishaps involving motor vehicles. MCL 500.3121; MSA 24.13121. The legislative intent then becomes less clear.

MCL 500.3123; MSA 24.13123 establishes certain exceptions to this rule of broad coverage. The first exception occasions the matter at bar.

"Damage to the following kinds of property is excluded from property protection insurance benefits: (a) Vehicles and their contents, including trailers, operated or designed for operation upon a public highway by power other than muscular power, unless the vehicle is parked in a manner as not to cause unreasonable risk of the damage which occurred."

An independent reading of this section compels the conclusion that Burk's motorcycle was clearly excluded from property coverage. Reference must also be made, however, to MCL 500.3101(2); MSA 24.13101(2):

"(2) 'Motor vehicle' as used in this chapter, except for § 3103, means a vehicle, including a trailer, operated or designed for operation upon a public highway by power other than muscular power *which has more than 2 wheels,* but does not include a moped as defined in § 32b

of Act No. 300 of the Public Acts of 1949, being § 257.32b of the Michigan Compiled Laws." (Emphasis added.)

The import of this section is to exclude motorcycles from the legislative definition of "motor vehicles". Resolution of this apparent contradiction in legislative intent requires recourse to basic principles of statutory construction.

In *White v Ann Arbor,* 406 Mich 554, 562; 281 NW2d 283 (1979), the Supreme Court stated that:

"The primary and fundamental rule of constitutional or statutory construction is that the Court's duty is to ascertain the purpose and intent as expressed in the constitutional or legislative provision in question. Also, while intent must be inferred from the language used, it is not the meaning of the particular words only in the abstract or their strictly grammatical construction alone that governs. The words are to be applied to the subject matter and to the general scope of the provision, and they are to be considered in light of the general purpose sought to be accomplished or the evil sought to be remedied by the constitution or statute."

A comprehensive review of the no-fault act discloses numerous examples of ambiguity in the use of the terms "vehicle" and "motor vehicle". See *e.g.,* MCL 500.3102, 500.3106, 500.3113(a), 500.3114(3), (4); MSA 24.13102(1), 24.13106, 24.13113(a), 24.13114(3), (4). In each instance, the term "vehicle" clearly means "motor vehicle".

It should be noted that while the no-fault act does not require motorcycles to be covered by no-fault insurance, neither does the act preclude the purchase of such coverage. See *Porter v Michigan Mutual Liability Co,* 80 Mich App 145, 149; 263 NW2d 318 (1977), *modified on other grounds* 407 Mich 175; 284 NW2d 463 (1979), and 1978 Annual

Survey of Michigan Law, *Insurance Law,* 25 Wayne L Rev 539, 555 (1979).

The use of the term "vehicle" in MCL 500.3123(a); MSA 24.13123(a), instead of "motor vehicle", appears to be another example of legislative inadvertence. We believe that the Legislature intended to include motorcycles within the ambit of the section's exclusionary clause.

It is clear under MCL 500.3123(a) that an automobile owner may not recover no-fault benefits for damage to his automobile unless it was properly parked at the time of the accident. An automobile owner has the option of purchasing collision coverage if he wishes to insure his car against damage resulting from accidents other than those in which his car is properly parked. *Shavers v Attorney General,* 402 Mich 554, 626; 267 NW2d 72 (1978). It is consistent with the intent and purposes of the no-fault act to presume that the Legislature intended a similar result in matters involving property damage to motorcycles.

This conclusion does no violence to the constitutional result reached in *Shavers, supra.* In rejecting an equal protection attack on the exclusion of motorcycles from no-fault coverage, *Shavers* noted two justifications for the exclusion. First, statistics show that the motorcyclist is rarely at fault in motorcycle-automobile collisions. Second, motorcyclists are far more likely to be killed or seriously injured in such collisions than are those persons involved in ordinary collisions. Plainly, the inclusion of motorcycles in a no-fault system would result in exaggerated premiums.

In the case at bar, even though the first justification may carry limited relevance, the second justification carries none. Property damage to automobiles is not a factor in determining no-fault pre-

mium costs. Since autobmobile owners are required to insure their own vehicles for property damage, it is reasonable to expect a similar intent in the case of motorcyclists.

The foregoing analysis is not affected by *Underhill v Safeco Ins Co,* 407 Mich 175; 284 NW2d 463 (1979). Unlike *Underhill,* the focus of the present case is upon legislative intent, not constitutional infirmity where legislative intent was undisputed. Moreover, the question of whether a motorcyclist is entitled to personal injury protection benefits involves significantly different considerations from the question of whether he should be able to recover no-fault benefits for damages to his motorcycle arising from a collision with an automobile. The most profound difference is, again, that no-fault policies extend no property coverage to any vehicles involved in nonparking related accidents.

This leaves Burk's final claim that, if motorcycles cannot be covered for property damage under the provisions of MCL 500.3123(a), he should be free to pursue his traditional tort remedies. We do not agree. Tort liability has been abolished with respect to unintentionally occasioned property damage arising from the use, ownership, or maintenance of motor vehicles within this state. An automobile owner who has not obtained his own collision insurance has no recourse to tort when his automobile is damaged by another insured vehicle. There is no evidence of a legislative intent to provide motorcyclists with a unique remedy in this regard.

We now turn to the issue of serious impairment of body function. The applicable statutory section, MCL 500.3135(1); MSA 24.13135(1), provides that:

"(1) A person remains subject to tort liability for

noneconomic loss caused by his or her ownership, maintenance or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function or permanent serious disfigurement."

The case at bar presents that particularly troublesome form of injury which, while temporarily disabling, presents no spectre of chronic distress or recurrence. Given the fact that abrasions, contusions and their attendant minor discomforts fall outside the ambit of the foregoing section, it remains necessary to scrutinize the nature of clavicular fractures as they relate to the statute.

The clavicle is one of the most frequently fractured bones in the human body. The incidence of these lesions is growing rapidly because of the increased number of violent motor vehicle collisions.

The clavicle itself is an elongated bone comprising an integral part of the shoulder girdle. It is joined at one end to the scapula, or shoulder blade, and at the other end to the sternum, or breast bone. It extends horizontally outward and is situated just above the first rib on either side of the neck. The clavicle is the only bony connection between the arm and the trunk. Because of its position in the human body, the clavicle is a fundamental component of the human shoulder. A peculiar feature of the clavicle is that it begins to ossify (change from gristle to bone) before any other bone in the body.

The symptonology attendant to clavicular fractures consists of severe pain, inability to rotate the shoulder completely and stiffness. Use of the affected arm is greatly diminished.

If there is little displacement or deformity after a fracture of the clavicle, recovery usually follows if the arm is placed in a sling and the patient is

kept quiet. In cases of some displacement, the shoulders are pulled backward and the arm is supported and drawn forward. The arm should not be used much for several months thereafter. Moderate exercise is indicated to avoid a frozen shoulder and undue arm and hand stiffness.

The prognosis for such injuries is excellent. Healing is ordinarily rather complete and complications are almost nonexistent. In a hierarchy of severity of fractures, clavicular breaks are minor in scale. See DePalma, *The Management of Fractures and Dislocations* (Philadelphia, W. B. Saunders Co, 1970), pp 486-494, and Maloy, *Legal Anatomy and Surgery* (2d ed, 1955), pp 171-176.

The matter at bar does not deviate from the above medical summation. The chief disability, other than pain, suffered by Burk was a pronounced inability to use his arm and shoulder during his convalescence. While mobility itself was not a small casualty of this status, it would appear that the greater detriment was in dexterity and social physical activity. This status could be compared to the temporary loss of an arm.

No one would dispute that the loss of an arm would amount to a serious impairment of body function, given the function and use of an arm. The same conclusion would be militated in those instances where an injury resulted in loss of mobility of the shoulder girdle. The only factor separating the matter at bar from the foregoing examples is the present injury's temporary nature. We do not find that factor to be of any real significance in this case.

Many purposes for no-fault insurance have been judicially articulated. One of its obvious goals is to keep so-called minor personal injury cases out of court. *McKendrick v Petrucci,* 71 Mich App 200;

247 NW2d 349 (1976). An equally clear purpose is to ensure that the catastrophically injured victim may recover those damages traditionally allowable in tort. *Workman v Detroit Automobile Inter-Insurance Exchange,* 404 Mich 477; 274 NW2d 373 (1979). Another aim of the statute is to lower insurance premiums. *Moore v Travelers Ins Co,* 475 F Supp 891 (ED Mich, 1979). It is stated in *Hill v Aetna Life & Casualty Co,* 79 Mich App 725; 263 NW2d 27 (1977), that no-fault's basic purpose is to ensure compensation of persons injured in automobile accidents.

The preceding citations carry a common theme, *i.e.,* that the statute is remedial in nature. Subject to the limitation expressed in *McKendrick, supra,* the statute must be liberally construed in favor of those it intends to benefit: the accident victims.

Adherents of a policy of maintaining a high definitional threshold for the phrase "serious impairment of body function" use as one of their chief arguments the contention that an injury must have long-lasting effects to meet this threshold. In this case such a policy would point to a conclusion that a clavicular fracture is not a serious impairment of a body function.

The theory that the severity of an injury must be largely determined by its required period of convalescence is consistent with neither logic nor law. An injury such as whiplash can last for weeks yet have no real effect on the functioning of one's body processes. By way of contrast, a pronounced cerebral concussion may result in temporary loss of consciousness which could well be a serious impairment of body function. It is clear that longevity of recovery is but one element to be used in ascertaining whether a given injury amounts to a serious impairment of body function.

The Legislature recognized as much when it omitted "permanent", "long-lasting", "lengthy" or any other descriptive, temporal word in describing serious impairment. That the Legislature was aware of its option is readily apparent from its use of the word "permanent" to qualify serious disfigurement in the same statutory section.

Any effort to impose time requirements in the area of serious impairment of body function amounts to a judicial engrafting of an additional requirement onto a plainly worded statute. This we cannot do.

The foregoing analysis removes the chief roadblock in resolving the issue herein: whether Burk's fractured clavicle was a serious impairment of his body function. For the duration of his convalescence, Burk's use of his arm and shoulder was greatly reduced. This, in turn, limited his mobility. These factors amount to a serious impairment of body function as a matter of law.

We would be remiss if we did not discuss the potential constitutional problems arising from the current status of the law in the immediately foregoing area. As we have already observed, the statutory phrase "serious impairment of body function" has created a long-standing problem in the area of no-fault litigation. It is a problem which only grows with each succeeding opinion from this Court.

The statute itself provides utterly no guidance on the parameters of the term. It was asserted as early as 1973 that the phrase did not provide standards sufficiently precise for legal interpretation. *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 477-481; 208 NW2d 469 (1973). The Supreme Court rejected this contention, stating that the word "serious" had been

frequently construed in the past. See fn 9, 389 Mich 478.

*Constitutionality of 1972 PA 294, supra,* was, as noted at 389 Mich 461, not precedentially binding. Footnote 1 states that:

"It is important to emphasize the fact that an advisory opinion does not constitute a decision of the Court and is not precedentially binding in the same sense as a decision of the Court after a hearing on the merits."

The true test of whether the phrase "serious impairment of body function" was unduly vague awaited the trial and appellate crucible of actual cases. The same was not long in coming.

In *McKendrick, supra,* this Court held that a case of tendonitis in the plaintiff's right arm was a sufficiently grave injury as to preclude a summary resolution of the threshold issue. *McKendrick* went on to state that the term "serious" was nebulous, but cited *Constitutionality, supra,* to the effect that the word was not unduly vague. *McKendrick's* thrust was to expand the scope of the power reposed in the trier of fact to decide whether an injury met the no-fault threshold. However, the case set no definitional parameters for the term "serious".

The next case, *Vitale v Danylak,* 74 Mich App 615; 254 NW2d 593 (1977), eschewed a complete prohibition against summary dispositions of threshold questions, again noting the pivotal nature of the word "serious" and reiterating its chameleon-like qualities. See *Vitale, supra,* 620.

The controversy then deviated somewhat. In *Stevens v Hogue,* 85 Mich App 185; 279 NW2d 735 (1978), the question of jury instructions was ad-

dressed. The trial judge had given the following definition of "serious":

"The word serious is not generally used to signify a dangerous condition but rather to define a grave, important, or weighty trouble." *Id.,* 189, fn 3.

The preceding instruction was drawn from *Brown v Metropolitan Life Ins Co,* 65 Mich 306, 315; 32 NW 610 (1887), a case cited approvingly in fn 9 of *Constitutionality, supra,* 478.

*Stevens* went on, at 189, to note that:

"At the present time, no standard instructions have been developed for no-fault cases. The court's instruction in this case seems to us to be accurate, and fair to both sides. It informs the jury of an acceptable meaning of a somewhat nebulous phrase. See, *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441; 208 NW2d 469 (1973), *McKendrick v Petrucci,* 71 Mich App 200; 247 NW2d 349 (1976), *Vitale v Danylak,* 74 Mich App 615; 254 NW2d 593 (1977). Plaintiff can claim no prejudice from an instruction which was not more limited than the statutory phrase, but rather, gives it some substance."

Two other cases, *Smith v Sutherland,* 93 Mich App 24; 285 NW2d 784 (1979), and *Karas v White,* 101 Mich App 208; 300 NW2d 320 (1980), also serve to point out the need for clearer jury instructions or other definitional guidelines in the threshold area.

Two recent cases of note demonstrate that even this Court is vexed by the vague nature of the questioned phrase. In *Pohl v Gilbert,* 89 Mich App 176; 280 NW2d 831 (1979), a spinal sprain with limited effects was deemed a serious impairment of body function, whereas in *Cassidy v McGovern,* 98 Mich App 100; 296 NW2d 200 (1980), a double

fracture of the lower bones of the right leg was held not to constitute a serious impairment of body function.

The point is obvious. As Judge Phillip C. Elliott so succinctly states in *Watkins v City Cab Corp,* 97 Mich App 723, 724-725; 296 NW2d 162 (1980):

"by using the uncertain phrase 'serious impairment of body function', the no-fault act utterly fails to accomplish that purpose and, ironically, makes auto-accident litigation even more of a crap game."

The jury's role is inferentially expanded even further by *Brooks v Reed,* 93 Mich App 166; 286 NW2d 81 (1979), which holds that a physician's affidavit may not be used in determining whether a serious impairment of body function exists.

Reference is made to *Giaccio v Pennsylvania,* 382 US 399, 402-403; 86 S Ct 518; 15 L Ed 2d 447 (1966), which states that:

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits *or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.*" (Emphasis added.)

*Giaccio* then states:

"Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce. This state Act as written does not even begin to meet this constitutional requirement."

"* * * The State contends that even if the Act would

have been void for vagueness as it was originally written, subsequent state court interpretations have provided standards and guides that cure the former constitutional deficiencies. We do not agree. All of the so-called court-created conditions and standards still leave to the jury such broad and unlimited power * * * that the jurors must make determinations of the crucial issue upon their own notions of what the law should be instead of what it is."

The foregoing quotations are a concise statement of the dilemma fast approaching Michigan courts. Unless the trends change, the law in *Giaccio* will squarely apply in an adverse fashion against the no-fault law. We call on the Supreme Court and/or the Legislature to supply these needed definitional parameters.

The judgment of the Ingham County Circuit Court in denying a summary judgment of dismissal in favor of defendant DAIIE as to the property damage is reversed and the matter remanded for entry of that judgment.

The judgment of the Ingham County Circuit Court of no cause of action in favor of defendant Warren is reversed and remanded for a new trial consistent with this opinion.

No costs are awarded in either instance because of the novelty of the issues presented. We retain no jurisdiction.

BEASLEY, J., concurred.

T. M. BURNS, P.J. *(concurring)*. I concur in the result reached by the majority on the authority of this Court's opinions in *Braden v Spencer,* 100 Mich App 523; 299 NW2d 65 (1980), and *Degrandchamp v Michigan Mutual Ins Co,* 99 Mich App 664; 299 NW2d 18 (1980).