MICHIGAN LIFE INSURANCE COMPANY v COMMISSIONER OF INSURANCE

Docket No. 60384. Submitted July 13, 1982, at Lansing.—Decided October 19, 1982. Leave to appeal applied for.

Michigan Life Insurance Company had offered mortgage disability insurance to persons in all occupational classifications, charging a uniform rate to all purchasers, regardless of risk. However, it decided to issue no new policies for persons employed in "Class B" occupations, which includes miners. The Insurance Bureau issued a notice of hearing, alleging that Michigan Life had engaged in an unfair trade practice. The Insurance Commissioner found Michigan Life to be committing an unfair trade practice and ordered it to cease refusing to offer mortgage disability insurance to otherwise eligible miners. Michigan Life appealed, Life Association of Michigan intervened as a party plaintiff by stipulation and the Ingham Circuit Court, Jack W. Warren, J., reversed. The Insurance Commissioner appealed. *Held:*

1. It is an unfair trade practice for an insurer to refuse to insure an individual merely because his age, residence, handicap or occupation increases the risk of loss to the insurer.

2. An administrative agency may announce new principles through adjudicative proceedings in addition to rule-making proceedings.

Reversed.

R. B. MARTIN, J., dissented. He would hold that it is not an unfair trade practice for an insurer to refuse to insure an individual because his age, residence, handicap or occupation increased the insurer's risk of loss and would affirm.

REFERENCES FOR POINTS IN HEADNOTES

[1] 43 Am Jur 2d, Insurance §§ 269 *et seq.*, 283 *et seq.*
[2, 5] 43 Am Jur 2d, Insurance §§ 260, 266.
[3] 2 Am Jur 2d, Administrative Law § 483 *et seq.*
[4] 1 Am Jur 2d, Administrative Law §§ 131, 138, 162-166.

OPINION OF THE COURT

1. INSURANCE — JUDICIAL CONSTRUCTION.

Insurance laws are to be liberally construed in the interests of the public, policyholders and creditors.

2. INSURANCE — UNFAIR TRADE PRACTICES — JUDICIAL CONSTRUCTION.

It is an unfair trade practice for an insurer to refuse to insure an individual merely because his age, residence, handicap, or occupation increases the risk of loss to the insurer (MCL 500.2027; MSA 24.12027).

3. INSURANCE — COMMISSIONER OF INSURANCE — APPEAL — FINDINGS OF FACT.

The findings of fact of the Commissioner of Insurance under the Fair Trade Practices Act are conclusive if supported by a preponderance of the evidence (MCL 500.2041; MSA 24.12041).

4. ADMINISTRATIVE LAW — RULES — RULE-MAKING — DUE PROCESS.

An administrative agency need not always promulgate rules to cover every conceivable situation before enforcing a statute; an administrative agency may announce new principles through adjudicative proceedings in addition to rule-making proceedings.

DISSENT BY R. B. MARTIN, J.

5. INSURANCE — UNFAIR TRADE PRACTICES — JUDICIAL CONSTRUCTION.

*It is not an unfair trade practice for an insurer to refuse to insure an individual because his age, residence, handicap, or occupation increases the insurer's risk of loss (MCL 500.2027; MSA 24.12027).*

*Downs, Zagaroli & Downs, P.C.* (by *Tom Downs* and *Michael A. Zagaroli),* for plaintiff Michigan Life Insurance Company.

*Miller, Canfield, Paddock & Stone* (by *John D. Pirich* and *Brian A. Kaser)* for intervening plaintiff Life Association of Michigan.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *John Blanchard,* Assistants Attorney General, for defendant.

Before: ALLEN, P.J., and CYNAR and R. B. MARTIN,* JJ.

ALLEN, P.J. The Insurance Commissioner appeals of right from a judgment of the Ingham County Circuit Court, entered September 17, 1980, which upholds Michigan Life Insurance Company's decision to discontinue offering mortgage disability policies to miners.

Michigan Life had offered mortgage disability insurance to persons in all occupational classifications, charging a uniform rate to all purchasers, regardless of risk. However, in early 1977, it decided to issue no new policies for persons employed in "Class B" occupations,[1] which includes miners.

On September 22, 1978, the Insurance Bureau staff issued a notice of hearing, alleging that Michigan Life had engaged in an unfair trade practice, contrary to § 2027 of the Michigan Insurance Code, MCL 500.2027; MSA 24.12027, by refusing to offer mortgage disability insurance to miners. The notice of hearing was prompted by a letter of complaint on behalf of members of the United Steel Workers of America. A hearing was held before an examiner on December 19, 1978, and on September 6, 1979, a proposal for decision was issued, recommending that Michigan Life be found in violation of § 2027. Exceptions and responses were filed thereafter. On April 8, 1980, the commissioner issued a final order finding Michigan Life in

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] Michigan Life's risk categories are divided into four classes: Occupations in Class AAA are considered to be the least hazardous and include most "white collar" workers; Class AA includes white collar workers whose occupations are subject to certain factors making them more hazardous than Class AAA; Class A occupations are considered more hazardous than those in Class AA and includes industrial workers using machinery; occupations in Class B are considered the most hazardous of the four groups and includes workers using heavy machinery and unskilled laborers.

violation of § 2027. Michigan Life was ordered to cease refusing to offer mortgage insurance to otherwise eligible miners.

Michigan Life petitioned the circuit court for review of the administrative decision. Life Association of Michigan intervened as a party plaintiff by stipulation. The circuit court reversed the bureau's final order and this appeal followed.

MCL 500.2027; MSA 24.12027 provides in part:

"Unfair methods of competition and unfair or deceptive acts or practices in the business of insurance include:

"(a) Refusing to insure, or refusing to continue to insure, or limiting the amount of coverage available to an individual or risk because of any of the following:

"(i) Race, color, creed, marital status, sex, or national origin, except that marital status may be used to classify individuals or risks for the purpose of insuring family units.

"(ii) The residence, age, handicap, or lawful occupation of the individual or the location of the risk, *unless there is a reasonable relationship between the residence, age, handicap, or lawful occupation of the individual or the location of the risk and the extent of the risk or the coverage issued or to be issued,* but subject to subparagraph (iii). This section shall not prohibit an insurer from specializing in or limiting its transactions of insurance to certain occupational groups, types, or risks as approved by the commissioner of insurance. The commissioner shall approve the specialization for an insurer licensed to do business in this state and whose articles of incorporation contained a provision on July 1, 1976, requiring that specialization.

"(iii) For property insurance, the location of the risk, unless there is a statistically significant relationship between the location of the risk and a risk of loss due to fire within the area in which the insured property is located. As used in this subparagraph, 'area' means a single zip code number under the zoning improvement plan of the United States postal service.

\* \* \*

"(c) Charging a different rate for the same coverage based on sex, marital status, age, residence, location of risk, handicap, or lawful occupation of the risk unless the rate differential is based on sound actuarial principles, a reasonable classification system, and is related to the actual and credible loss statistics or reasonably anticipated experience in the case of new coverages. This subdivision shall not apply if the rate has previously been approved by the commissioner." (Emphasis added.)

The controversy in this case focuses on the meaning of the reasonable relationship exception as set forth in the emphasized language in subparagraph (ii). According to the Commissioner's interpretation, a reasonable relationship exists between lawful occupation and the extent of the risk where: (1) no meaningful rate can be calculated to cover the risk by using available statistical tools, or (2) the insurance premium can be calculated but would be so high as to equal or exceed the amount insured. Michigan Life argues that an insurer may legally refuse coverage because of occupation upon a showing that the occupation creates a risk of loss that is higher than that associated with other occupations.

It was clearly established at the administrative hearing that the risk of loss for miners is higher than for other occupations. Richard Johnson, the expert for the bureau, testified that while Michigan Life's average monthly mortgage premium rate varies from 2.75 to 5 percent of the monthly mortgage payment, the premium for "surface miners" would vary from 5 to 9 percent of the monthly mortgage payment.[2] Henry Wren, an as-

[2] Mr. Johnson divided the risk of loss for miners into that for surface miners and underground miners. While underground mining is more hazardous than surface mining and the premium charged

sistant vice-president and actuary for Michigan
Life, testified that for 1977, 68 out of 129 Class B
claims were caused by job-related injuries, while
for the same period only 15 out of 60 Class AAA,
AA, and A claims were job-related. Further, in
1974, when the company insured all occupations at
a uniform rate, the company's loss ratio (claims as
a ratio to premiums) was close to 200 percent.
However, after changing the policy coverage to
exclude Class B risks, the loss ratio dropped to a
little less than 100 percent.

Since Michigan Life made no claim that a mean-
ingful insurance rate could not be calculated and
the evidence showed that premiums would not
equal or exceed the benefits available, the commis-
sioner found that Michigan Life's policy was out-
side the reasonable relationship exception. The
circuit court reversed, holding that Michigan Life
may decline to offer mortgage disability insurance
to miners, and to other persons employed in Class
B occupations, since these occupations are associ-
ated with a higher risk of loss.

In interpreting a statute, the object is to ascer-
tain the legislative intent in enacting the provi-
sion. *Smith v City Comm of Grand Rapids,* 281
Mich 235, 240; 274 NW 776 (1937). The specific
language of the statute itself should be examined.
*Kalamazoo City Education Ass'n v Kalamazoo
Public Schools,* 406 Mich 579, 603; 281 NW2d 454
(1979).

Legislative intent must be determined from con-
sideration of all provisions of the enactment in
question. *Braden v Spencer,* 100 Mich App 523,

underground miners would approach the monthly mortgage payment,
ranging from $120 to $225 on a $300 monthly mortgage, the develop-
ment of a reasonable premium rate for underground miners appears
irrelevant since the record indicates that there are no underground
coal mines in Michigan.

530; 299 NW2d 65 (1980). Each word, sentence, and provision should be read together to harmonize the meaning, giving effect to the act as a whole. *General Motors Corp v Erves (On Rehearing)*, 399 Mich 241, 255; 249 NW2d 41 (1976). While legislative intent must be inferred from the statutory language, the particular words are to be applied to the subject matter and the general scope of the provision and considered in light of the general purpose sought to be accomplished or the evil sought to be remedied by the statute. *White v City of Ann Arbor*, 406 Mich 554, 562; 281 NW2d 283 (1979). Where the Legislature has properly delegated authority to an administrative agency to carry out the mandates of a statute, the courts should give deference to the agency's interpretation of the provision, although they are not bound thereby. *Lorraine Cab v Detroit*, 357 Mich 379, 384; 98 NW2d 607 (1959). Finally, our courts have often recognized that the insurance industry is of great public interest and insurance laws are to be liberally construed in the interests of the public, policyholders, and creditors. *Attorney General ex rel Comm'r of Ins v Michigan Surety Co*, 364 Mich 299, 325; 110 NW2d 677 (1961).

Applying these principles, we find the commissioner's interpretation of the reasonable relationship exception better effectuates the statute's intent than Michigan Life's. The purpose of § 2027(a)(ii), which is to protect individuals from an arbitrary denial of insurance coverage on the basis of certain characteristics, would be vitiated if an insurer can refuse coverage merely on the showing of a higher incidence of loss experience. Further, reading § 2027 as a whole, Michigan Life's interpretation would seriously undermine the protection from arbitrary rate differentials

because of residence, age, handicap, lawful occupation, or location of the risk as provided by subparagraph (c), since the insurer could refuse coverage altogether merely because a protected classification is more expensive to insure. Finally, Michigan Life's interpretation would result in unfair competition with insurance companies that write all coverage at a uniform rate. Sanctioning an insurer's refusal to underwrite all but the premier risks would put those who insure groups with the protected characteristics at a competitive disadvantage and could result in the unavailability of coverage to these groups. This result surely cannot embody the Legislature's intent in enacting § 2027(a)(ii).

Not only would the commissioner's interpretation best effectuate the protections of this provision, Michigan Life's interpretation would render the regulatory scheme null and void. Any insurer could collect data on most protected classifications which they wished not to write and show a statistical correlation between that group and some other group. Two recent opinions from this Court support our holding. In *American Way Service Corp v Comm'r of Ins,* 113 Mich App 423; 317 NW2d 870 (1982), the insurer refused to offer credit life insurance to individuals within the 55 to 64 year age group. While the opinion does not expressly interpret § 2027(a)(ii), it apparently rejects the argument that a mere higher risk of loss establishes the requisite reasonable relationship, as the Court found that the insurer's refusal to insure was not reasonably related to the extent of risk, notwithstanding the clear correlation between age and the extent of risk. See, Baker and Ettinger, *Insurance Law,* 27 Wayne L Rev 827, 847 (1981). Moreover, the Court explicitly rejected Michigan Life's inter-

pretation of § 2027(a)(ii) in *DAIIE v Comm'r of Ins,* 119 Mich App 113; 326 NW2d 444 (1982). There, the insurer refused to offer automobile insurance to people under age 21 unless they resided with a parent or guardian who at the time of application was either already insured or about to become insured with the company. This Court upheld the commissioner's finding that the insurer was in violation of § 2027(a)(ii).

"Petitioner's [the insurer's] interpretation ignores the statutory language stating that an insurance company may refuse to insure a group only if the cost is unreasonable. The mere fact that one group is more expensive to insure than another does not preclude fixing a reasonable rate. This point is especially pertinent because *car drivers must carry insurance to drive in this state.*" 119 Mich App 120.

Accordingly, we conclude that the lower court's order reversing the order of the insurance commissioner must be reversed.

Several other issues raised by the parties warrant discussion. The commissioner contends that the circuit court applied an improper standard of review in evaluating factual findings. The circuit court stated that its review of the commissioner's factual findings was *de novo* on the record and review of the commissioner's legal conclusions was to be made in accordance with the applicable provisions of the Administrative Procedures Act, MCL 24.306; MSA 3.560(206). We note that any misstatement of the standard would not require reversal since the court did not scrutinize the commissioner's factual determinations. Rather, the court found that the commissioner's interpretation of § 2027(a)(ii) was correct, a question of law. Nev-

ertheless, we find the court properly stated the standard for reviewing questions of fact.

While generally, administrative decisions are to be affirmed if supported by material, competent, and substantial evidence, Const 1963, art 6, § 28; MCL 24.306(d); MSA 3.560(206)(d), the Insurance Code sets out a more lenient standard for review-ing the commissioner's factual determinations under the Uniform Trade Practices Act provisions.[3] MCL 500.2041; MSA 24.12041 provides:

"(1) Any order or decision of the commissioner under this uniform trade practices act shall be subject to review *as provided in section 244. The findings of fact of the commissioner, and any modification thereof as provided for in subsection (2) of this section, if supported by the preponderance of the evidence, shall be conclusive.*

"(2) To the extent that the order of the commissioner is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the commissioner. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the commissioner, the court may order such additional evidence to be taken before the commissioner and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The commissioner may modify his findings of fact, or make new findings by reason of the additional evidence so taken, and he shall file such modified or new findings, which, if supported by the preponderance of the evidence, shall be conclu-

[3] Const 1963, art 6, § 28, states that the review, *as a minimum,* shall include whether the administrative determination is supported by competent, material, and substantial evidence on the whole record. MCL 24.306(d); MSA 3.560(206)(d) provides that *except when a statute or constitution provides for a different scope of review,* the court shall set aside an agency determination if not supported by competent, material, and substantial evidence.

sive, and his recommendation, if any, for the modification or setting aside of his original order, with the return of such additional evidence." (Emphasis added.)

MCL 500.244; MSA 24.1244 provides in part:

"(3) The cause shall be heard before the said court *as a civil case in chancery upon such transcript of the record and such additional evidence* as may be offered by any of the parties at the hearing of said cause before the court." (Emphasis added.)

Thus, the circuit court must review the cause as a civil case in chancery, evaluate the evidence on the record and any additional evidence presented to it, and accept the commissioner's findings if supported by a preponderance of the evidence.

Michigan Life argues that the circuit court properly refused to apply the commissioner's interpretation of § 2027(a)(ii), since due process requires that the agency give notice of its interpretation before holding the industry to it. However, promulgation of rules is not necessarily required before enforcement of a statute. An agency may announce new principles through adjudicative proceedings without violating the tenets of due process. *DAIIE v Comm'r of Ins, supra.* See, also, *National Labor Relations Bd v Bell Aerospace Co Div of Textron, Inc,* 416 US 267, 292-294; 94 S Ct 1757; 40 L Ed 2d 134 (1974); *Securities & Exchange Comm v Chenery Corp,* 332 US 194, 202-203; 67 S Ct 1575; 91 L Ed 1995 (1947). We also note that the commissioner's opinion provides that, if requested, proofs would be reopened to determine whether properly calculated rates for miners would equal or exceed the amount of insurance and that no fine be levied.

Since the circuit court's order is reversed, we

need not address whether the court erred by holding that Michigan Life's decision to refuse to offer mortgage disability insurance to all persons employed in Class B occupations, as well as miners, was legal.

We have reviewed Michigan Life's remaining claims of error and find them without merit. The Insurance Bureau's inaction against other insurance companies which may have violated § 2027 does not imply that its action against Michigan Life is unlawful or that it will not prosecute others at a later time. Nor should the action be dismissed because the commissioner's final order was not issued "within a reasonable period", as required by MCL 24.285; MSA 3.560(185), since, even if unreasonable, Michigan Life has failed to demonstrate any prejudice. Finally, we reject Michigan Life's claim that this action should be dismissed because the commissioner has failed to identify any individuals denied mortgage disability insurance. Michigan Life's witnesses admitted at the hearing that it was its policy to refuse mortgage disability insurance to persons employed in Class B occupations. Thus, it can be reasonably inferred that some individuals may have been denied mortgage disability insurance because of their lawful occupation as miners. Indeed, it is doubtful that a person denied mortgage disability insurance would report the claim, especially if the individual obtained such insurance elsewhere. See *American Way Service Corp, supra.*

The circuit court's order reversing the commissioner's order is reversed. Costs to appellant.

CYNAR, J., concurred.

R. B. MARTIN, J. *(dissenting).* The bureau believes three factors must be examined in consider-

ing whether there "* * * is a reasonable relationship between the * * * lawful occupation * * * and the extent of the risk": (1) Is the risk so large as to preclude development of a meaningful rate? (2) Would the maximum loss threaten the insurer's solvency? (3) Would the premium be so large as to approach the amount of recovery?

The company and intervenor felt the statutory language is explicit and unmistakably clear in permitting the insurance companies the discretion to write or refuse insurance based on reasonable risk classifications.

The bureau was citing the company for violation of the code. The bureau had the burden of proof of showing that violation. MCL 500.2030(2); MSA 24.12030(2). The bureau claimed it proved the violation by showing the company relied on improper standards in refusing to give disability mortgage insurance to miners. The company responded that the bureau was using the wrong standards. We have then basically a question of law as to which party had adopted the proper standard for determining whether an unfair trade practice existed. The company's practice certainly met the standards the company set for itself but did not meet the standards as set by the bureau.

In searching the Insurance Code and its federal progenitor (§ 59 Stat 33-34 [1945]; 15 USC 1011-1015) for some concise legislative statement of the purpose of the code, I find none. It is apparent that the principal purpose was to regulate the insurance industry to protect the insuring public from companies which couldn't carry out their portion of the insurance contract.

The Uniform Trade Practices Act, MCL 500.2001 et seq.; MSA 24.12001 et seq., was aimed specifically at various particular types of unfair competi-

tion, fraudulent acts, and misleading practices. Section 2027 was added in 1976. It is aimed at "unfair methods of competition and unfair or deceptive acts and practices in the business of insurance".

It is an unfair practice to refuse to insure anyone because of "race, color, creed, marital status, sex or national origin", except for one limited reason relative to marital status.

This is in subsection (a)(i).

The statute then says it is an unfair practice to refuse to insure because of (a)(ii) "residence, age, handicap or lawful occupation of the individual or the location of the risk, *unless there is a reasonable relationship between the residence,* age, handicap, or *lawful occupation* of the individual or the location of the risk and *the extent of the risk"*.

Looking at the two groups as applicants for life, disability, or fire insurance, race, color, creed, marital status, sex, or national origin should not cause any difference in the risk involved generally. No one should be refused insurance because of any of those factors. The Legislature saw it that way and spoke.

As to the second group, residence, age, handicap, location of risk, and occupation, all may well greatly affect the risk. The Legislature then said a company could not refuse to insure because of any of these factors "unless there was a reasonable relationship between the residence, age, handicap, location of risk or occupation, and the extent of the risk".

In looking at the record, the witnesses on both sides showed there was a reasonable relationship between the occupation and the extent of the risk. Even the bureau's expert felt there was substan-

tially more risk involved in the B classification of occupations than in the average occupation.

If the Legislature meant to guarantee that every worker, no matter the occupation, have life or mortgage disability insurance, no matter the risk, provided the bureau's three factors were met, it could have said so. However, the Legislature has recognized that some elements should not be a factor in a company's decision to insure or not to insure (color, sex, national origin, etc.). Relative to other elements, the reasonableness of the relationship between the element and the extent of the risk must be considered (age, handicap, occupation, etc.). Certainly, there is more risk of disability for miners than for people in Class AAA. There is a reasonable relationship between the occupation and the extent of the risk. The Legislature did not create any other standard except the reasonableness of the relationship between the occupation and the extent of the risk. If it had wanted to guarantee more life or disability insurance being available for any occupation, it could have enumerated the criteria the bureau here used in ruling on the case. The language is not in the statute and I believe the bureau exceeded its authority in requiring these standards.

This thinking is corroborated by the fact that the Michigan Legislative Joint Committee on Administrative Rules, on March 4, 1980, rejected a proposed rule interpreting § 2027 in the manner the bureau suggests should be done in this case.

If the statute or this section of the statute had been drafted, passed, and approved by the Governor for the stated purpose of forcing insurance companies to write life and disability insurance for anyone in a high risk occupation unless the bureau's standards had been met, the whole Legisla-

ture could have adopted the bureau's standards or at least its joint committee could have.

This Court does not determine whether the bureau's standards are practical, reasonable, and the best of many ideas. From a review of the record, the commission has failed to show the company violated the statutory standards. The circuit court should be affirmed.